# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL MILLER, Derivatively on Behalf of Nominal Defendant UNITEDHEALTH GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>STEPHEN J. HEMSLEY, JOHN F. REX, DIRK C. McMAHON, TIMOTHY J. NOEL, HEATHER CIANFROCCO, TIMOTHY P. FLYNN, MICHELE J. HOOPER, F. WILLIAM McNABB III, VALERIE C. MONTGOMERY RICE, JOHN H. NOSEWORTHY, CHARLES D. BAKER, PAUL R.GARCIA, KRISTEN GIL, ANDREW P. WITTY, DAVID S. WICHMANN, RICHARD T. BURKE, WILLIAM C. BALLARD, JR., KENNETH I. SHINE, RODGER A. LAWSON, AND ROBERT J. DARRETTA,<br><br>Defendants,<br><br>and<br><br>UNITEDHEALTH GROUP, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Miller ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative complaint on behalf of and for the benefit of nominal defendant UnitedHealth Group, Inc. ("UnitedHealth" or the "Company") against

certain of its board of directors (the "Board") and executive officers (together, the "Individual Defendants," defined below) seeking to remedy their breach of fiduciary duties, waste of corporate assets, insider selling, and unjust enrichment occurring from at least January 1, 2016 to present, inclusive (the "Relevant Period"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts. Because Plaintiff lacks access to all information and documents on which his claims are based, certain of his allegations are made upon information and belief. After Plaintiff has had the opportunity to conduct discovery, he will, to the extent necessary and appropriate, amend or seek leave to amend this Complaint. Plaintiff's information and belief is derived from his counsel's investigation, which included counsel's review and analysis of the following: (i) the Company's filings with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases, news reports, analyst reports, investor conference call transcripts, public statements, and other publications by or pertaining to the Company and the Defendants named herein; (iii) documents produced by the Company pursuant to 8 Del. C. § 220 of the Delaware General Corporation Law ("Section 220"); (iv) publicly available legal filings, including a federal securities class action against the Company and certain of the Individual Defendants captioned *California Public Employees' Retirement System v. UnitedHealth Group Inc. et al.,* Case No. 0:24-cv-01743 (D. Minn.) (the "Securities Class Action"); and (v) other publicly available records.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a verified stockholder derivative action brought by Plaintiff on behalf of and for the benefit of nominal defendant UnitedHealth against the Individual Defendants.

2.    UnitedHealth is a vertically integrated insurer, healthcare provider, pharmacy, benefit manager, and healthcare software and services vendor. The Company is the largest health insurance company of all time, insuring over 50 million people with a current market capitalization of $281 billion. At its peak, on November 4, 2024, UnitedHealth had a market capitalization of $567.16 billion. The Company operates two complementary businesses: UnitedHealthcare, the Company's insurance arm, and Optum, the Company's information and technology-enabled health services business.[1]

### A.  The Medicare Advantage Payments Fraud Scheme

3.    Under the Balanced Budget Act of 1997, Congress created Medicare Part C, commonly known as the Medicare Advantage ("MA") program. Under MA, Medicare-eligible individuals can opt to receive their Medicare-covered benefits from private insurance plans.

4.    For over two decades, UnitedHealth has operated a highly lucrative MA program through which the Centers for Medicare & Medicaid Services ("CMS"), the federal administrator of Medicare, makes capitated payments to UnitedHealth for every

---

[1] UnitedHealthcare includes four reporting segments: UnitedHealthcare Employer & Individual, UnitedHealthcare Community & State, UnitedHealthcare Global, and UnitedHealthcare Medicare & Retirement. Optum includes three reporting segments: Optum Health, Optum Insight, and Optum RX.

person that UnitedHealth enrolls in its MA program ("Member").  The amount per Member that CMS pays to UnitedHealth each year is higher for Members who have certain pre-existing conditions and/or more complex diagnoses.

5.      Throughout the Relevant Period, the Individual Defendants orchestrated a sweeping and deliberate scheme to fraudulently inflate revenues through the Company's Medicare Advantage business (the "CMS Fraud Scheme").  The CMS Fraud Scheme involved adding unwarranted diagnoses codes to Members' medical records—a process known as "upcoding"—to increase the payouts UnitedHealth received from CMS.  To achieve these increased payouts through upcoding, UnitedHealth utilized a variety of mechanisms, including questionable diagnostic tests during medical assessments in Members' homes (called "HouseCalls"), health provider pressure tactics, and retroactive chart reviews by UnitedHealth that covertly added additional diagnoses to Members' medical records without the knowledge of the Member or their primary care provider. Members rarely received treatment for the fabricated diagnoses added to their medical record by UnitedHealth through upcoding.

6.      UnitedHealth also increased its MA profits by providing nursing homes with lucrative payments to disincentivize them from sending its MA Members to the hospital— thus saving the Company money through reduced insured medical service payments.

7.      UnitedHealth systematically executed its CMS Fraud Scheme to generate billions of dollars in excessive, unwarranted, and illegal MA payments from CMS.  The discovery of the CMS Fraud Scheme ultimately subjected the Company to civil and

criminal investigations by the Office of Inspector General at the U.S. Department of Health and Human Services ("OIG") and the Department of Justice ("DOJ").

8.      On October 21, 2024, OIG published the results of a years-long investigation into abuse by private insurers who sell Medicare Advantage health insurance plans (the "2024 OIG Report").  The 2024 OIG Report implicated UnitedHealth for perpetrating potentially fraudulent Medicare Advantage practices, finding that UnitedHealth had received as much as $5.4 billion in overpayments from CMS.  Following the 2024 OIG Report, the DOJ has since launched both civil and criminal investigations into UnitedHealth's CMS Fraud Scheme.

### B. Fraud in the Company's Acquisition of Change Healthcare

9.      On January 6, 2021, UnitedHealth, through its Optum unit, announced a $13 billion agreement to acquire Change Healthcare (the "Change Acquisition"), the largest healthcare electronic data interchange clearinghouse ("EDI") in the United States.[2]  The Change Acquisition immediately raised alarms with state and federal regulators.

10.     On February 24, 2022, the DOJ, along with the state Attorney Generals for Minnesota and New York, filed an antitrust lawsuit to block the Change Acquisition (the "DOJ Antitrust Suit") on the grounds that, among other things, it would give UnitedHealth

---

[2] An EDI clearinghouse facilitates the transmission of electronic transactions between payers and health care professionals or facilities.  Clearinghouses often integrate with practice management or hospital information systems to eliminate time spent keying information into multiple programs or requesting/submitting transactions individually. UnitedHealthcare, EDI Clearinghouse Options, https://www.uhcprovider.com/en/resource-library/edi/edi-clearinghouse-opt.html (last visited Dec. 5, 2025)

a near monopoly over EDI clearinghouse services and a significantly unfair advantage in pricing and services.  At the time, serious (and now-realized) concerns were raised regarding the unprecedented access the Change Acquisition would give UnitedHealth to competitively sensitive information ("CSI") from virtually every major healthcare payer and provider in the United States, including many of the Company's rivals.

11.   As a defense to the DOJ Antitrust Suit, the Company argued that it possessed advanced firewalls and internal policies that would prevent UnitedHealth personnel and entities from accessing the Change Healthcare CSI.  UnitedHealth's firewall and internal policy representations assuaged the presiding court; ultimately, the court dismissed the DOJ Antitrust Suit and allowed the Company to move forward with Change Acquisition, which was completed in October 2022.

12.   The truth, however, was that the Company did not possess the necessary firewall and internal policy protections that it had represented to the court and promised the public.  After the Change Acquisition was complete, UnitedHealth personnel and entities across the entire organization could freely access Change Healthcare's CSI, including sensitive competitor data.  The Change Healthcare firewalls did not prevent internal misuse of CSI, were extremely vulnerable to unauthorized outside access, and prone to data breaches.

13.   Just fourteen months after the Change Acquisition was completed, on February 22, 2024, UnitedHealth disclosed that Change Healthcare had suffered the largest health data breach in U.S. history, affecting over 190 million patients (the "Change Data Breach").  The Change Data Breach was attributed to UnitedHealth's failure to implement

basic safeguards like multi-factor authentication and, ultimately, exposed social security numbers, medical histories, and billing information.

14.    Unsurprisingly, the Change Data Breach subjected UnitedHealth to significant scrutiny from regulators and the media.  The Change Data Breach caused Congress to call Defendant Andrew P. Witty ("Witty") to testify before the U.S. Senate and the U.S. House of Representatives on May 1, 2024.  During the hearings, members of Congress expressed grave concern about the behemoth that UnitedHealth had become and the risk it posed to the safety, security, health, and financial well-being of American taxpayers.  Members of Congress specifically pointed to UnitedHealth's abuses of the Medicare Advantage program.

15.    The wrongful conduct described herein has caused UnitedHealth harm by severely damaging the Company's reputation and goodwill, and by causing the loss of billions of dollars of the Company's market capitalization.  The Individual Defendants' wrongful conduct has subjected the Company to multiple costly lawsuits, including the Securities Class Action, which will almost certainly consume the Company for years to come.

16.    Further damaging the Company's reputation, on October 10, 2023, the DOJ notified UnitedHealth that it had launched a "non-public antitrust investigation into the [C]ompany" (the "October 2023 DOJ Investigation").

17.    Meanwhile, certain UnitedHealth insiders did not fare as badly.  Shortly after the Company was on notice of the October 2023 DOJ Investigation, Defendant Stephen J. Hemsley ("Hemsley") and several other senior executives collectively unloaded more than

$100 million of their personally held UnitedHealth stock at artificially inflated prices while the market and other investors remained unaware of the new federal antitrust investigation into UnitedHealth.

18.     On May 30, 2025, Plaintiff made a formal written demand to the Board to investigate, take appropriate legal action, and seek all other appropriate relief against certain of the Individual Defendants, for the wrongful conduct described herein (the "Demand").[3]  After more than a month without a response from the Board, Plaintiff's counsel followed up with the Board to confirm receipt of the Demand.  Although the Board replied to Plaintiff's follow-up communication and confirmed receipt of the Demand, the Board otherwise brushed off the Demand and has not responded further, amounting to a *de facto* wrongful refusal of Plaintiff's Demand.  Because the Board has abdicated its duty to take action in response to the Demand, Plaintiff must prosecute the Company's causes of action against the Individual Defendants.

## II.     <u>JURISDICTION AND VENUE</u>

19.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b), 20(a), 20A, and 21(D) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

---

[3] Exhibit A.

20.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401, as well as pursuant to §27 of the Exchange Act, because: (i) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; and (iii) the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

### III.   PARTIES

#### A. Plaintiff

21.     Plaintiff Michael Miller is a current holder of UnitedHealth common stock and has been a continuous owner of UnitedHealth common stock since 2005.

#### B. Nominal Defendant

22.     Nominal Defendant UnitedHealth is a Delaware corporation with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealth's common stock is listed on the New York Stock Exchange (NYSE) under the ticker symbol "UNH."

#### C. Individual Defendants

23.     Defendant David S. Wichmann ("Wichmann") served as UnitedHealth's Chief Executive Officer ("CEO") and as a member of the Company's Board of Directors (the "Board") from 2017 until March 2021.  From 2016 through 2021, UnitedHealth paid Defendant Wichmann at least $95,794,573.00 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|:-----------:|:------------------:|
| 2021 | $        11,221,093 |
| 2020 | $        17,872,713 |

| | | |
|---|---|---|
| 2019 | $ | 18,886,989 |
| 2018 | $ | 18,107,356 |
| 2017 | $ | 17,389,976 |
| 2016 | $ | 12,316,446 |

According to the Company's 2021 Proxy Statement, Defendant Wichmann beneficially owned 1,316,103 shares of UnitedHealth's common stock as of April 7, 2020.

24.    Defendant Witty served as UnitedHealth's CEO and as a member of the Company's Board of Directors (the "Board") from February 2021 until May 2025. Witty previously served as a director from August 2017 to March 2018, at which point he stepped down to serve as CEO of Optum. From 2017 through 2024, UnitedHealth paid Defendant Witty at least $139,850,490.00 in total compensation, as follows:

| Fiscal Year | Total Compensation | |
|---|---|---|
| 2024 | $ | 26,339,215 |
| 2023 | $ | 23,534,936 |
| 2022 | $ | 20,865,106 |
| 2021 | $ | 18,433,143 |
| 2020 | $ | 12,857,176 |
| 2019 | $ | 16,526,020 |
| 2018 | $ | 21,232,550 |
| 2017 | $ | 62,344 |

Between 2021 and 2023, while in possession of material, nonpublic information ("MNPI") concerning UnitedHealth's true business health, Defendant Witty sold 27,536 shares of UnitedHealth common stock, for total proceeds of $13,517,999.89, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/21/2021 | 6,000 | $414.15 | $2,484,900.00 |
| 7/18/2022 | 11,376 | $527.90 | $6,005,390.40 |

| 4/27/2023 | 6,160 | $487.49 | $3,002,949.49 |
| 7/19/2023 | 4,000 | $506.19 | $2,024,760.00 |

According to the Company's 2025 Proxy Statement, Defendant Witty beneficially owned 349,651 shares of UnitedHealth's common stock as of April 4, 2025. Defendant Witty is also named as a defendant in the Securities Class Action.

25.     Defendant Hemsley has been UnitedHealth's CEO since May 2025; Chair of the Board since November 2019, and a director since 2000. Defendant Hemsley was also UnitedHealth's Executive Chair of the Board from September 2017 to November 2019; CEO from November 2006 to August 2017; President from May 1999 to November 2014; Chief Operating Officer ("COO") from September 1998 to November 2006; and Senior Executive Vice President and also a member of the Office of the Chairman from June 1997 to September 1998. From 2016 through 2024, UnitedHealth paid Defendant Hemsley at least $57,269,150, as per the chart below:

| Fiscal Year | Total Compensation |
|-------------|-------------------|
| 2024 | $    856,218 |
| 2023 | $    595,348 |
| 2022 | $    579,840 |
| 2021 | $    574,628 |
| 2020 | $    557,795 |
| 2019 | $  7,389,261 |
| 2018 | $ 11,352,513 |
| 2017 | $ 18,454,153 |
| 2016 | $ 17.765,612 |

While in possession of MNPI concerning UnitedHealth's true business health, from 2016 through 2023, Defendant Hemsley sold 1,115,136 personally held shares of UnitedHealth common stock for $405,396,712 in proceeds, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 1/29/2016 | 200,000 | $113.30 | $ 22,660,700 |
| 5/11/2020 | 45,637 | $289.11 | $ 13,194,022 |
| 7/16/2020 | 59,012 | $307.04 | $ 18,118,773 |
| 7/17/2020 | 170,000 | $307.74 | $ 52,315,800 |
| 10/23/2020 | 75,000 | $329.35 | $ 24,700,950 |
| 10/23/2020 | 23,579 | $329.86 | $ 7,777,863 |
| 7/16/2021 | 60,000 | $420.62 | $ 25,237,110 |
| 8/23/2021 | 70,000 | $426.30 | $ 29,841,154 |
| 10/25/2021 | 32,014 | $448.04 | $ 14,343,649 |
| 10/25/2021 | 29,471 | $448.97 | $ 13,231,448 |
| 10/25/2021 | 13,515 | $449.76 | $ 6,078,533 |
| 10/26/2021 | 50,000 | $455.57 | $ 22,778,700 |
| 7/26/2022 | 99,312 | $534.27 | $ 53,059,224 |
| 10/17/2023 | 121,515 | $540.58 | $ 65,688,591 |
| 12/5/2023 | 66,081 | $550.39 | $ 36,370,196 |

According to the Company's 2025 Proxy Statement, Defendant Hemsley beneficially owned 1,251,137 shares of UnitedHealth's common stock as of April 4, 2025.

26.    Defendant John F. Rex ("Rex") has served as UnitedHealth's Chief Financial Officer ("CFO") since 2016. During the Relevant Period, UnitedHealth paid Defendant Rex at least $112,204,234 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $ 18,731,183 |
| 2023 | $ 16,074,137 |
| 2022 | $ 15,832,820 |
| 2021 | $ 14,637,967 |
| 2020 | $ 12,597,062 |
| 2019 | $ 10,627,085 |
| 2018 | $ 8,587,912 |

| | | |
|---|---|---|
| 2017 | $ | 7,930,845 |
| 2016 | $ | 7,185,223 |

While in possession of MNPI concerning UnitedHealth's true business health, from 2020 through 2022, Defendant Rex sold 50,795 personally held shares of UnitedHealth common stock for $20,339,121.65 in proceeds, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 7/17/2020 | 22,174 | $308.43 | $6,839,104.65 |
| 7/29/2021 | 8,376 | $411.84 | $3,449,555.09 |
| 7/29/2021 | 7,062 | $412.27 | $2,911,471.93 |
| 7/29/2022 | 13,183 | $541.53 | $7,138,989.99 |

According to the Company's 2025 Proxy Statement, Defendant Rex beneficially owned 514,783 shares of UnitedHealth's common stock as of April 4, 2025.

27.    Defendant Dirk C. McMahon ("McMahon") served as UnitedHealth's Chief Operating Officer ("COO") from February 2021 until his retirement on April 1, 2024. McMahon first joined the Company in 2003 as President and CEO of Benefits Operations, during the Relevant Period, McMahon held the positions of Executive Vice President of Operations for UnitedHealth Group (2014-2017), President and COO of Optum (2017-2019), and CEO of UnitedHealthcare (2019 – April 2021).  From 2019 through 2023, UnitedHealth paid Defendant McMahon at least $68,123,909 in total compensation,[4] as per the chart below:

---

[4] Defendant McMahon's total compensation beginning in 2016 was not publicly disclosed until Fiscal Year 2019, when he became a Named Executive Officer subject to SEC public reporting requirements.

13

| Fiscal Year | Total Compensation |
|---|---|
| 2023 | $ 16,074,137 |
| 2022 | $ 15,832,820 |
| 2021 | $ 14,643,488 |
| 2020 | $ 12,606,484 |
| 2019 | $  8,966,980 |

While in possession of MNPI concerning UnitedHealth's true business health, on August 18, 2022, Defendant McMahon sold 14,715 personally held shares of UnitedHealth common stock for $7,994,939.09 million in proceeds. According to the Company's 2024 Proxy Statement, McMahon beneficially owned 360,068 shares of UnitedHealth's common stock as of April 5, 2024.

28.    Defendant Heather Cianfrocco ("Cianfrocco") is Executive Vice President of Governance, Compliance, and Information Security, a position she has held since May 2025. Defendant Cianfrocco first joined the Company in 2008 as Vice President of Network Operations; during the Relevant Period, Defendant Cianfrocco held several positions, including as CEO of Optum Rx, President of Optum, and most recently, CEO of Optum. UnitedHealth paid Defendant Cianfrocco at least $11,449,467 in total compensation during 2024.[5] According to the Company's 2025 Proxy Statement, Defendant Cianfrocco beneficially owned 135,773 shares of UnitedHealth's common stock as of April 4, 2025.

29.    Defendant Timothy J. Noel ("Noel") is CEO of UnitedHealthcare, a position he has held since January 23, 2025. Defendant Noel first joined the Company in 2007, and

---

[5] Cianfrocco's compensation prior to 2024 is publicly undisclosed.

throughout the Relevant Period was CEO UnitedHealthcare's Medicare and Retirement division, directly overseeing the Company's Medicare Advantage plans.  Defendant Noel's compensation during the Relevant Period is undisclosed, however, according to a Form 4 filed with the SEC on September 25, 2025, as of September 23, 2025, Defendant Noel beneficially owns 9,286 shares of UnitedHealth's common stock.

30.    Defendant Charles D. Baker ("Baker") has served as a member of the UnitedHealth Board since November 2023.  Baker also serves as a member of the Audit and Finance Committee and of the Health and Clinical Practice Policies Committee.  From 2023 through 2024, UnitedHealth paid Defendant Baker at least $425,399 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $            366,072 |
| 2023 | $              59,327 |

According to the Company's 2025 Proxy Statement, Defendant Baker beneficially owned 971 shares of UnitedHealth's common stock as of April 4, 2025.

31.    Defendant Timothy P. Flynn ("Flynn") has served as a member of the UnitedHealth Board since 2017.   Defendant Flynn also serves as Chair of the Compensation and Human Resources Committee and as a member of the Governance Committee.   From 2017 through 2024, UnitedHealth paid Defendant Flynn at least $2,826,988 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $            400,765 |
| 2023 | $            400,162 |
| 2022 | $            380,559 |

| | | |
|---|---|---|
| 2021 | $ | 374,350 |
| 2020 | $ | 362,293 |
| 2019 | $ | 353,172 |
| 2018 | $ | 325,550 |
| 2017 | $ | 230,137 |

According to the Company's 2025 Proxy Statement, Defendant Flynn beneficially owned 13,623 shares of UnitedHealth's common stock as of April 4, 2025.

32.    Defendant Paul R. Garcia ("Garcia") has served as a member of the UnitedHealth Board since 2021.  Garcia also serves as a member of the Audit and Finance Committee.  From 2021 through 2024, UnitedHealth paid Defendant Garcia at least $1,100,361 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation | |
|---|---|---|
| 2024 | $ | 366,567 |
| 2023 | $ | 366,800 |
| 2022 | $ | 351,994 |
| 2021 | $ | 15,000 |

According to the Company's 2025 Proxy Statement, Defendant Garcia beneficially owned 4,716 shares of UnitedHealth's common stock as of April 4, 2025.

33.    Defendant Kristen Gil ("Gil") has served as a member of the UnitedHealth Board since 2022.  Gil also serves as a member of the Audit and Finance Committee.  From 2022 through 2024, UnitedHealth paid Defendant Gil at least $888,871 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation | |
|---|---|---|
| 2024 | $ | 514,769 |
| 2023 | $ | 351,800 |
| 2022 | $ | 22,302 |

According to the Company's 2025 Proxy Statement, Defendant Gil beneficially owned 1,661 shares of UnitedHealth's common stock as of April 4, 2025.

34.     Defendant Michele J. Hooper ("Hooper") has served as a member of the UnitedHealth Board since 2007, and as Lead Independent Director since 2021.  From 2016 through 2024, UnitedHealth paid Defendant Hooper at least $3,418,498 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $        441,349 |
| 2023 | $        441,519 |
| 2022 | $        426,640 |
| 2021 | $        366,094 |
| 2020 | $        365,953 |
| 2019 | $        365,900 |
| 2018 | $        338,795 |
| 2017 | $        338,616 |
| 2016 | $        333,632 |

While in possession of MNPI concerning UnitedHealth's true business health, from 2017 through 2018, Defendant Hooper sold 35,000 personally held shares of UnitedHealth common stock for $7,376,256 in proceeds, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/16/2017 | 5,000 | $170.88 | $854,375.00 |
| 3/16/2017 | 5,000 | $170.90 | $854,491.00 |
| 3/16/2017 | 5,000 | $170.90 | $854,479.00 |
| 12/4/2017 | 5,000 | $222.20 | $1,111,003.00 |
| 1/31/2018 | 5,000 | $237.79 | $1,188,950.00 |
| 1/31/2018 | 5,000 | $237.73 | $1,188,650.00 |
| 9/13/2018 | 5,000 | $264.86 | $1,324,308.50 |

According to the Company's 2025 Proxy Statement, Hooper beneficially owned 40,040 shares of UnitedHealth's common stock as of April 4, 2025.

35.    Frederick William McNabb III ("McNabb") has served as a member of the UnitedHealth Board since 2018.  McNabb also serves as Chair of the Audit and Finance Committee and as a member of the Governance Committee.  From 2018 through 2024, UnitedHealth paid Defendant McNabb at least $1,963,724 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $ 393,602 |
| 2023 | $ 392,883 |
| 2022 | $ 372,437 |
| 2021 | $ 347,669 |
| 2020 | $ 330,784 |
| 2019 | $ 330,325 |
| 2018 | $ 189,626 |

According to the 2025 Proxy, Defendant McNabb beneficially owned 13,656 shares of UnitedHealth's common stock as of April 4, 2025.

36.    Defendant Valerie C. Montgomery Rice ("Rice") has served as a member of the UnitedHealth Board since 2017.  Defendant Rice also serves as Chair of the Health and Clinical Practice Policies Committee and as a member of the Compensation and Human Resources Committee.  From 2017 through 2024, UnitedHealth paid Defendant Rice at least $2,626,370 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $ 424,262 |
| 2023 | $ 391,050 |
| 2022 | $ 370,591 |

| | | |
|---|---|---|
| 2021 | $ | 363,973 |
| 2020 | $ | 349,058 |
| 2019 | $ | 346,716 |
| 2018 | $ | 318,421 |
| 2017 | $ | 62,299 |

According to the 2025 Proxy, Defendant Rice beneficially owned 6,256 shares of UnitedHealth's common stock as of April 4, 2025.

37. Defendant John H. Noseworthy ("Noseworthy") has served as a member of the UnitedHealth Board since 2019. Defendant Noseworthy also serves as Chair of the Governance Committee and as a member of the Compensation and Human Resources Committee and of the Health and Clinical Practice Policies Committee. From 2019 through 2024, UnitedHealth paid Defendant Noseworthy at least $2,080,721 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation | |
|---|---|---|
| 2024 | $ | 390,756 |
| 2023 | $ | 391,050 |
| 2022 | $ | 391,050 |
| 2021 | $ | 340,787 |
| 2020 | $ | 345,784 |
| 2019 | $ | 221,294 |

According to the 2025 Proxy, Defendant Noseworthy beneficially owned 5,763 shares of UnitedHealth's common stock as of April 4, 2025.

38. Defendant William C. Ballard, Jr. ("Ballard") served as a member of the UnitedHealth Board from 1993 until 2020; from 2016 through 2020, Defendant Ballard was a member of the Compensation and Human Resources Committee (Committee Chair

2019-2020) and of the Nominating and Corporate Governance Committee. From 2016 through 2020, UnitedHealth paid Defendant Ballard $1,574,852 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|:---:|:---|
| 2020 | $                244,158 |
| 2019 | $                368,828 |
| 2018 | $                325,395 |
| 2017 | $                318,329 |
| 2016 | $                318,142 |

While in possession of MNPI concerning UnitedHealth's true business health, from 2016 through 2019, Defendant Ballard sold 83,000 personally held shares of UnitedHealth common stock for $16,933,035 in proceeds, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|:---:|:---:|:---:|:---:|
| 2/1/2016 | 8,000 | $114.93 | $919,444 |
| 4/20/2016 | 5,000 | $134.87 | $674,355 |
| 6/16/2016 | 5,000 | $138.58 | $692,895 |
| 11/14/2016 | 3,000 | $151.21 | $453,615 |
| 2/14/2017 | 5,000 | $162.68 | $813,400 |
| 4/20/2017 | 5,000 | $170.47 | $852,325 |
| 6/7/2017 | 5,000 | $182.64 | $913,211 |
| 8/3/2017 | 5,000 | $193.98 | $969,915 |
| 1/23/2018 | 5,000 | $246.35 | $1,231,750 |
| 1/23/2018 | 5,000 | $246.40 | $1,232,000 |
| 8/8/2018 | 5,000 | $258.82 | $1,294,105 |
| 8/8/2018 | 5,000 | $258.84 | $1,294,205 |
| 1/22/2019 | 5,000 | $266.61 | $1,333,035 |
| 5/6/2019 | 5,000 | $239.02 | $1,195,120 |
| 7/23/2019 | 12,000 | $255.31 | $3,063,660 |

As of July 23, 2019, Defendant Ballard beneficially owned 61,309 shares of UnitedHealth's common stock.

39.    Richard T. Burke ("Burke") founded UnitedHealth in 1977 and served as a member of the UnitedHealth Board from 1977 until 2022.  Defendant Burke was Chairman of the Board from 2006 until 2017.  From 2016 through 2022, UnitedHealth paid Defendant Burke $3,110,851 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2022 | $ 172,512 |
| 2021 | $ 433,827 |
| 2020 | $ 432,634 |
| 2019 | $ 433,401 |
| 2018 | $ 406,075 |
| 2017 | $ 607,628 |
| 2016 | $ 624,774 |

While in possession of MNPI concerning UnitedHealth's true business health, from 2016 through 2022, Defendant Burke sold 758,990 beneficially owned shares of UnitedHealth common stock for $185,376,256.50 in proceeds, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/4/2016 | 50,000 | $113.69 | $5,684,610.00 |
| 5/13/2016 | 25,000 | $129.30 | $3,232,532.50 |
| 9/7/2016 | 20,000 | $135.80 | $2,716,000.00 |
| 9/7/2016 | 20,000 | $134.81 | $2,696,216.00 |
| 12/8/2016 | 45,000 | $158.66 | $7,139,488.50 |
| 12/15/2016 | 15,000 | $159.80 | $2,397,000.00 |
| 1/31/2017 | 10,000 | $161.68 | $1,616,750.00 |
| 3/2/2017 | 50,000 | $167.48 | $8,373,925.00 |
| 5/4/2017 | 47,500 | $173.19 | $8,226,719.75 |
| 8/21/2017 | 15,000 | $191.71 | $2,875,626.00 |
| 1/18/2018 | 20,000 | $239.57 | $4,791,386.00 |
| 2/28/2018 | 10,000 | $229.90 | $2,299,016.00 |
| 3/1/2018 | 400 | $229.00 | $91,600.00 |
| 3/19/2018 | 10,000 | $224.36 | $2,243,610.00 |
| 4/23/2018 | 15,000 | $234.20 | $3,513,027.00 |
| 5/21/2018 | 15,000 | $248.82 | $3,732,261.00 |
| 8/1/2018 | 15,000 | $254.79 | $3,821,913.00 |

| 9/12/2018 | 20,000 | $263.41 | $5,268,164.00 |
| 9/13/2018 | 10,000 | $264.90 | $2,649,027.00 |
| 11/28/2018 | 6,090 | $281.72 | $1,715,685.76 |
| 1/17/2019 | 15,000 | $260.55 | $3,908,259.00 |
| 1/23/2019 | 11,500 | $268 | $3,082,000.00 |
| 3/12/2019 | 5,000 | $245.01 | $1,225,055.00 |
| 3/19/2019 | 5,000 | $257.32 | $1,286,583.50 |
| 4/24/2019 | 10,000 | $229.75 | $2,297,501.00 |
| 5/29/2019 | 10,000 | $241.99 | $2,419,883.00 |
| 6/11/2019 | 10,000 | $248.00 | $2,480,000.00 |
| 8/8/2019 | 5,000 | $246.40 | $1,232,000.00 |
| 8/23/2019 | 2,000 | $231.50 | $463,000.00 |
| 9/17/2019 | 2,500 | $232.76 | $581,897.00 |
| 9/18/2019 | 2,500 | $232.60 | $581,500.00 |
| 9/19/2019 | 2,500 | $233.40 | $583,500.00 |
| 9/20/2019 | 2,500 | $234.20 | $585,500.00 |
| 10/16/2019 | 25,000 | $236.56 | $5,914,015.00 |
| 1/16/2020 | 15,000 | $299.45 | $4,491,750.00 |
| 2/19/2020 | 10,000 | $306.04 | $3,060,385.00 |
| 3/16/2020 | 5,000 | $237.00 | $1,185,000.00 |
| 3/17/2020 | 10,000 | $240.10 | $2,401,037.00 |
| 3/18/2020 | 5,000 | $212.00 | $1,060,000.00 |
| 3/19/2020 | 5,000 | $224.40 | $1,122,000.00 |
| 3/20/2020 | 10,000 | $228.39 | $2,283,921.00 |
| 7/22/2020 | 10,000 | $303.50 | $3,035,017.00 |
| 8/13/2020 | 15,000 | $320.59 | $4,808,820.00 |
| 11/6/2020 | 700 | $349.31 | $244,516.02 |
| 11/6/2020 | 4,300 | $350.35 | $1,506,520.05 |
| 11/6/2020 | 5,000 | $349.41 | $1,747,064.00 |
| 12/8/2020 | 7,000 | $349.78 | $2,448,443.90 |
| 12/10/2020 | 2,500 | $342.00 | $855,000.00 |
| 12/11/2020 | 3,000 | $336.50 | $1,009,500.00 |
| 12/15/2020 | 2,500 | $340.00 | $850,000.00 |
| 2/11/2021 | 5,000 | $335.80 | $1,678,992.00 |
| 2/18/2021 | 2,500 | $326.99 | $817,463.75 |
| 2/18/2021 | 1,250 | $327.36 | $409,194.50 |
| 2/18/2021 | 1,250 | $329.07 | $411,336.88 |
| 3/15/2021 | 4,000 | $353.33 | $1,413,300.00 |
| 3/16/2021 | 6,000 | $354.90 | $2,129,418.60 |
| 4/19/2021 | 2,500 | $391.25 | $978,125.00 |
| 4/20/2021 | 2,500 | $391.25 | $978,125.00 |

| 4/20/2021 | 10,000 | $395.43 | $3,954,250.00 |
| 6/10/2021 | 2,000 | $402.00 | $804,000.00 |
| 6/15/2021 | 4,000 | $400.25 | $1,601,000.00 |
| 6/21/2021 | 4,000 | $398.63 | $1,594,500.00 |
| 7/20/2021 | 8,000 | $414.31 | $3,314,440.00 |
| 7/22/2021 | 7,000 | $415.70 | $2,909,867.10 |
| 9/14/2021 | 2,500 | $416.75 | $1,041,875.00 |
| 9/15/2021 | 10,000 | $418.06 | $4,180,625.00 |
| 9/17/2021 | 2,500 | $419.00 | $1,047,500.00 |
| 11/23/2021 | 2,500 | $444.70 | $1,111,750.00 |
| 11/24/2021 | 2,500 | $450.00 | $1,125,000.00 |
| 1/20/2022 | 5,000 | $469.41 | $2,347,044.00 |
| 1/21/2022 | 4,000 | $468.50 | $1,874,000.00 |
| 2/16/2022 | 5,000 | $476.72 | $2,383,587.50 |
| 2/23/2022 | 4,000 | $465.30 | $1,861,182.40 |
| 2/25/2022 | 6,000 | $470.38 | $2,822,305.20 |
| 3/22/2022 | 4,000 | $511.14 | $2,044,567.60 |
| 3/23/2022 | 3,000 | $505.67 | $1,517,001.00 |
| 3/24/2022 | 3,000 | $508.80 | $1,526,400.00 |
| 5/16/2022 | 2,500 | $493.25 | $1,233,125.00 |
| 5/17/2022 | 2,500 | $493.50 | $1,233,750.00 |
| 5/19/2022 | 2,500 | $478.96 | $1,197,410.50 |

According to the Company's 2022 Proxy Statement, Defendant Burke beneficially owned 1,372,987 shares of UnitedHealth's common stock as of April 8, 2022.

40.     Defendant Robert J. Darretta ("Darretta") served as member of the UnitedHealth Board from 2007 until 2017; from 2016-2017, Defendant Darretta was a member of the Audit Committee.  From 2016 through 2017, UnitedHealth paid Defendant Darretta $504,822 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2017 | $          204,588 |
| 2016 | $          300,234 |

41.     Defendant Rodger A. Lawson ("Lawson") served as member of the UnitedHealth Board from 2011 until 2017; from 2016-2017, Defendant Lawson was Chair of the Compensation Committee.  From 2016 through 2018, UnitedHealth paid Defendant Lawson $927,401 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2018 | $          238,610 |
| 2017 | $          344,007 |
| 2016 | $          344,784 |

According to the Company's 2017 Proxy Statement, Defendant Lawson beneficially owned 26,542 shares of UnitedHealth's common stock as of March 14, 2017.

42.     Defendant Kenneth I. Shine ("Shine") served as member of the UnitedHealth Board from 2009 until 2018; from 2016 through 2018, Defendant Shine was a member of the Public Policy Committee.  From 2016 through 2018, UnitedHealth paid Defendant Shine $954,892 in total compensation, as per the chart below:

| Fiscal Year | Total Compensation |
|---|---|
| 2018 | $          318,421 |
| 2017 | $          318,329 |
| 2016 | $          318,142 |

While in possession of MNPI concerning UnitedHealth's true business health, from 2016 through 2018, Defendant Shine sold 3,322 personally held shares of UnitedHealth common stock for $598,590 in proceeds, as detailed in the chart below:

| Sale Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/20/2016 | 337 | $132.24 | $44,565.22 |
| 4/20/2016 | 625 | $132.32 | $82,700.63 |

| | | | |
|---|---|---|---|
| 10/21/2016 | 325 | $144.99 | $47,121.26 |
| 4/19/2017 | 838 | $169.12 | $141,718.37 |
| 11/14/2017 | 457 | $211.03 | $96,442.54 |
| 1/19/2018 | 198 | $242.55 | $48,024.70 |
| 4/19/2018 | 202 | $237.42 | $47,959.04 |
| 7/18/2018 | 177 | $255.72 | $45,262.44 |
| 11/9/2018 | 163 | $274.83 | $44,796.48 |

As of November 9, 2018, Defendant Shine beneficially owned 29,153 shares of UnitedHealth common stock.

43.     Defendants Wichmann, Witty, Hemsley, Rex, McMahon, Cianfrocco, and Noel are referred to herein as the "Officer Defendants." Defendants Witty, Hemsley, Baker, Flynn, Garcia, Gil, Hooper, McNabb, Rice, Noseworthy, Ballard, Burke, Darretta, Lawson, and Shine are referred to herein as the "Director Defendants." The Officer Defendants and the Director Defendants are collectively referred to herein as the "Individual Defendants" and, along with UnitedHealth, "Defendants." Defendants Witty, Hemsley, Rex, McMahon, Hooper, Ballard, Burke, and Shine are referred herein as the "Insider Trading Defendants." The Demand Defendants consist of Baker, Flynn, Garcia, Gil, Hemsley, Hooper, McNabb, Rice, and Noseworthy.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS[6]

44.     By reason of their positions as officers, directors, and/or fiduciaries of UnitedHealth and because of their ability to control the business and corporate affairs of UnitedHealth, at all relevant times, the Individual Defendants owed UnitedHealth and its

---

[6] Unless otherwise indicated, all emphasis is added.

stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage UnitedHealth in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of UnitedHealth and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes and did owe UnitedHealth and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

45.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of UnitedHealth, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with UnitedHealth, each of the Individual Defendants had knowledge of MNPI regarding the Company.

46.    To discharge their duties, the officers and directors of UnitedHealth were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of UnitedHealth were required to, among other things:

    (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

47.     In addition, UnitedHealth's Audit and Finance Committee, which consists of McNabb (Chair), Baker, Garcia, and Gil, is responsible for, among other things: "(a) [assisting] the [Board] in fulfilling its oversight responsibilities relating to (i) the conduct and integrity of the Company's financial reporting to any governmental or regulatory body, the public or other users thereof, (ii) the Company's compliance with legal and regulatory requirements . . . (iii) the efficacy of the Company's enterprise risk management structure and key processes . . . ."

48.     The Company's Audit and Finance Committee Charter states, in relevant part:

**Documents/Reports Review**

- Meet to review and discuss with management and the independent outside auditor the Company's annual and quarterly financial statements, including reviewing the Company's specific disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations. Based on its discussions with management and the independent outside auditor, the Committee shall recommend to the Board of Directors whether the Company's annual financial statements should be included in the Company's Annual Report on Form 10-K (or the Annual Report to Shareholders).

- Review the Annual Report on Form 10-K prior to filing.

- Discuss with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. Discussion of earnings releases as well as financial

information and earnings guidance may be done in a general manner (i.e., discussions of the types of information to be disclosed and the type of presentation to be made).

- Discuss significant findings and recommendations of the Company's independent outside auditor and the General Auditor and internal auditors, together with management's responses to those findings and recommendations.

- Review and discuss with the Company's Chief Executive Officer and Chief Financial Officer the procedures undertaken in connection with the Chief Executive Officer and Chief Financial Officer certifications for Forms 10-K and Forms 10-Q, including their evaluation of the Company's disclosure controls and procedures and internal controls.

*       *       *

**Enterprise Risk Management**

- Review with management, the Company's enterprise risk management framework, including the governance structure, the guidelines and policies for assessing, identifying, managing, monitoring and reporting of significant risks.

- Meet periodically with management to review the Company's significant risks and the steps management has taken to monitor, control or mitigate such risks.

**Financial Reporting Processes**

- In consultation with the Company's independent outside auditor, the General Auditor, and the internal auditors, consider the integrity of the Company's financial reporting processes, both internal and external.

- Discuss with management, the independent outside auditor, the General Auditor and the internal auditors, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent outside auditor setting forth significant financial reporting issues and judgements made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the

financial statements of the Company; and (d) the type and presentation of information to be included in earnings press releases (paying particular attention to any use of non-GAAP financial measures permitted under SEC rules).

**Process Analysis and Review**

- Establish regular and separate systems of reporting to the Committee by each of management, the General Auditor, and the independent outside auditor regarding any significant judgments, changes or improvements that have been made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

- Discuss with the independent outside auditor, at least annually, any audit problems or difficulties and management's responses, any difficulties the auditor encountered during the course of the audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and any significant disagreements with management. The discussions with the independent outside auditor should address, to the extent applicable, any accounting adjustments that were noted or proposed by the independent outside auditor but were "passed" (as immaterial or otherwise), any communications between the audit team and its national office with respect to auditing or accounting issues presented by the engagement; and any "management" or "internal control" letter issued, or proposed to be issued, by the independent outside auditor to the Company.

- Discuss, at least annually, with the independent outside auditor the matters required to be discussed by the applicable requirements of the PCAOB and the SEC.

*      *      *

- Inquire of the Company's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, and material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

**Other Activities**

- Review with management the system the Company has in place to ensure that the Company's financial statements, reports, and other financial information disseminated to the governmental organizations and the public satisfy legal requirements.

- Review and assess the effectiveness of the Company's policies, procedures and resource commitment in the areas of compliance, ethics, and privacy, by interacting with the leadership and management responsible for these functions.

- Consider any tax issues, legal and regulatory matters or employee complaints or similar matters brought to the attention of the Committee that may have a material impact on the Company's financial statements or accounting policies.

- Review and assess the effectiveness of the Company's policies, procedures and resource commitment in the areas of cybersecurity and data protection, including key risk areas and mitigation strategies.

*      *      *

- Oversee and review reports from the Chief Compliance and Ethics Officer regarding compliance with its Code of Business Conduct and Ethics and Principles of Ethics and Integrity.

- Receive and review periodic reports regarding matters relating to the Company's compliance with legal and regulatory requirements from the Chief Compliance and Ethics Officer, who has express authority to communicate directly with the Committee as necessary.

49.     The Company's Health and Clinical Practice Policies Committee, with Rice as Chair, together with Baker and Noseworthy as members, is responsible for, among other things, overseeing UnitedHealth's clinical practices and policies.

50.     The Company's Health and Clinical Practice Policies Committee Charter states in relevant part:

1.   Clinical Practices and Policies

- Oversee the Company's clinical practices and policies, including quality, key clinical trends and priorities.

- Oversee management's efforts and initiatives to expand access to health care, improve health care affordability, clinical care and safety, enhance the health care experience, achieve better health outcomes, advance health equity, and reduce health disparities.

- Oversee the responsible and ethical application of artificial intelligence in support of modernizing and improving the health care system.

51. Finally, UnitedHealth's Code of Conduct: Our Principles of Ethics & Integrity (the "Code of Conduct"), "applies to all employees, directors, and contractors" and purportedly helps UnitedHealth employees "sustain the highest possible standards of ethical behavior in our work."

52. According to an introductory letter from Defendant Witty included in the Code of Conduct:

> [e]thics and integrity are woven into our processes at all levels of the company and our culture. Whether you work at UnitedHealth Group, UnitedHealthcare or Optum, each one of us has the same responsibility – to consistently deliver Quality every day and to remember the person at the other end of every interaction or decision.[7]

53. Under the section titled "Integrity," the Code of Conduct states in relevant part:

- **Do not buy or sell any stock based on material non-public information you have received.**

  You must never use or disclose to others material, non-public information about UnitedHealth Group or another company as the basis for buying or selling stock.

---

[7] Following Defendant Witty's resignation, the Code of Conduct has since been modified, removing, *inter alia*, Witty's introductory letter. UnitedHealth's current Code of Conduct, remains substantially the same.

- **Do not use Company property, information, or your position for personal gain, or to compete with UnitedHealth Group.**

    Each of us has a duty to advance the Company's interests when an opportunity is presented. You may not use Company property, information, or your position with the Company to take advantage of corporate opportunities for your personal gain, unless the opportunity was first presented to and rejected by the Company, and you will not be competing with the Company's business activities.

- **Each director or employee involved in UnitedHealth Group's disclosure process is responsible for the accuracy and completeness of facts regarding the Company.**

    This includes representations to the Company's independent auditors, governmental regulators, and self-regulatory organizations. Directors and employees must review and critically analyze proposed disclosures or, where appropriate, delegate this task to others.

### Integrity of Books and Records

UnitedHealth Group is committed to the integrity of its records, books, and financial and other reporting. Employees are responsible for ensuring that all books, records, accounting, and reporting are accurate and complete, and properly reflect the actual transaction event recorded and are retained according to Company policy. In addition, U.S. securities laws impose specific obligations on each director or employee involved in the Company's financial disclosure process, including the Senior Financial Officers. The Senior Financial Officers and the individuals who assist them in the disclosure processes must be familiar with and comply with all controls and procedures that ensure that public reports and documents filed with the U.S. Securities and Exchange Commission meet the Company's obligations under U.S. securities laws and rules.

54.    Under the section titled "Accountability," the Code of Conduct states in relevant part:

### Our Commitments

We are accountable for complying with all applicable laws, regulations, and contractual obligations, with this Code of Conduct, and with the Company's policies and procedure. When we are accountable, we earn

the trust that our members, patients, providers, and other business partners place in us.

**Be Accountable**

We share the responsibility for preventing fraud, waste, and abuse in the health care system. UnitedHealth Group has established processes for identifying, reducing, and combating fraud, waste, and abuse.

55. Under the section titled "Privacy and Information Security," the Code of Conduct states in relevant part:

**Our Commitments**

Managing an individual's personal information respectfully, responsibly, and in accordance with all applicable laws builds trust individual-by-individual, serves our business objectives, and fosters enduring relationships with our stakeholders.

## V.   <u>SUBSTANTIVE ALLEGATIONS</u>

### A. Company Background

56. UnitedHealth is a Delaware corporation with its principal offices located in Minnetonka, Minnesota. The Company is a vertically integrated insurer, healthcare provider, pharmacy, benefit manager, and healthcare software services vendor. UnitedHealth is the world's ninth-largest company by revenue and is one of the largest healthcare companies of all time with a current market capitalization of $281 billion. At its peak on November 4, 2024, during the Relevant Period, UnitedHealth had a market capitalization of $567.16 billion.

57. The Company operates two complementary businesses: UnitedHealthcare, the Company's insurance arm, and Optum, the Company's information and technology-enabled health services business. As of December 4, 2024, UnitedHealthcare served 29.7

million Americans in its Employer & Individual health insurance plans, 53 million Americans in its dental, vision, hearing, and financial protection plans, and 13.8 million Americans that participate in the Company's Medicare Advantage, Medicare Part D, and Medicare Supplement plans.

58.     In April 2011, UnitedHealth created Optum to house its non-insurance businesses.  Today, Optum is the largest employer of physicians in America—employing 90,000 physicians, or 10% of all physicians in America.  Within Optum, there are three distinct and reportable business segments: Optum Health, Optum Insight, and Optum Rx.

59.     Optum Health is the Company's sprawling medical provider and financial services business; Optum Health provides medical care and financial services to 100 million consumers, and within Optum Health is Optum Financial and Optum Bank, which provides healthcare-related financial services and banking to more than 27 million consumer accounts with $24 billion in assets under management.  On April 30, 2024, *The Washington Post* published an article titled, "UnitedHealth grew very big. Now, some lawmakers want to chop it down," which included expert analysis by Christopher Whaley, a health-care economist at Brown University, who explained in the article that Optum Health allowed UnitedHealth to "'acquire providers and essentially pay [it]self.'"  Whaley expressed concern that the arrangement "'provides a disincentive to really care that much about prices and spending growth.'"

60.     Similarly, and as part of its "Health Care's Colossus" series, *STAT News* published an investigative report on November 25, 2024, titled "UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits."

In the report, Ron Howrigon, a healthcare consultant and former executive at Blue Cross Blue Shield, Cigna Healthcare, and Kaiser Permanente, said that UnitedHealth was "'cooking the books . . . by pushing things that are really insurance company profit over to medical expenses, because you own those doctors.'"  The *STAT News* investigative report included an interview with a physician who used to work within one of Optum's New York practices, who was quoted as saying that, "'[i]t's really a game the way [UnitedHealth] switch[es] money from their right pocket to their left.'"  A reference to how UnitedHealth incestuously moves money between Optum and UnitedHealthcare.

61.     Optum Insight is the Company's healthcare information technology business that, among other things, develops and sells enterprise healthcare management software (*i.e.* clinical, administrative, and financial management, payment processing, regulatory compliance, health plan management and optimization, care coordination, and pharmaceutical development).

62.     Optum Rx, a pharmacy benefit manager provides pharmacy care services through its network of more than 65,000 retail pharmacies, through home delivery, specialty and community health pharmacies, the provision of in-home and community-based infusion services and through rare disease and gene therapy support services.

### B. UnitedHealth's Lucrative Medicare Advantage Business

63.     One of UnitedHealth's most lucrative profit-making operations is its Medicare Advantage business.  MA is a privatized version of traditional Medicare, administered by CMS, which pays private insurers—such as UnitedHealth—to provide traditional Medicare benefits to qualifying senior citizens.  Unlike traditional Medicare's

fee-for-service model, insurers that offer MA plans are paid a set fee for each Member based on that Member's health risks.  The private insurer then covers the Member's care according to the terms of the Member's Medicare Advantage plan.

64.     MA plans also include a risk adjustment feature, which adjusts capitated payments from CMS based on the specific health status of each Member.  An insurer that offers MA plans, such as UnitedHealthcare, receives higher annual capitated payments from CMS for a Member that has more medical diagnoses, or in other words, a higher risk score.

65.     UnitedHealth provides CMS with the "risk adjustment" data of its Medicare Advantage Plan members annually.  CMS then uses the UnitedHealth-provided data to determine how much CMS will pay UnitedHealth each year for its Medicare Advantage Members.

66.     The diagnosis codes used to determine each Members' "risk score" must adhere to the following guidelines: (i) documented in an approved medical record during the prior year; and (ii) documented as a result of a face-to-face visit between the member and a healthcare provider.  CMS relies on the insurer and its contracted providers, including hospitals and physicians, to accurately document and submit the diagnosis codes to CMS.

67.     CMS allows insurers that offer MA plans to utilize health risk assessments ("HRAs") and retrospective chart reviews to collect and submit to CMS additional diagnoses for payments that may have not been captured during regular clinical health visits.  HRAs often occur as part of the Member's annual wellness visit or may be conducted at the Member's home.

68.     CMS also allows insurers offering MA Plans to review Members' medical charts to identify diagnoses that could lead to higher payments.  As part of a chart review, insurers examine medical records to look for potential diagnoses that may have not been previously reported or coded during standard clinical visits.  Based on these chart reviews, insurers can submit additional diagnoses to CMS, potentially increasing the risk-adjusted payments the insurer receives from CMS.

### C. The CMS Fraud Scheme

69.     Beginning as early as 2016 and continuing through at least July 28, 2025, UnitedHealth orchestrated a sweeping and deliberate scheme to fraudulently inflate revenues under the Company's Medicare Advantage business.  The CMS Fraud Scheme was a Company-wide scheme to dramatically increase the fees that the Company collected through its MA plans by adding unwarranted diagnosis codes to Members' medical records—a process known as "upcoding."  Because CMS makes higher annual payments to insurers for every MA Member that has a higher "risk score," UnitedHealth knew that reporting higher risk scores, even if there was no legitimate medical basis to support the higher scores, would generate higher payments from CMS.

70.     The Individual Defendants caused UnitedHealth to carry out the CMS Fraud Scheme through a variety of mechanisms, including the use of unproven in-home diagnostic tools, healthcare provider pressure tactics, and retroactive chart reviews and revisions.  Ultimately, the CMS Fraud Scheme caused CMS to overpay UnitedHealth by nearly $6 billion through the Company's MA Members.

### i.  The Three-Step Process to Coerce UnitedHealth Providers to "Find" Additional Medical Codes

71.     Although UnitedHealth's CMS Fraud Scheme dates back to at least 2016, the OIG raised public concerns about the Company's in-home HRAs in 2021.  On September 13, 2021, the OIG issued its investigative report on 2017 CMS MA payments related to chart reviews and HRAs (the "2021 OIG Report").[8]  The 2021 OIG Report revealed that UnitedHealth stood out amongst its insurance competitors for its use of chart reviews and HRAs to increase its risk-adjustment payments.[9]  For instance, in 2017, UnitedHealth received 40% ($3.7 billion of $9.2 billion) of the total risk-adjusted payments made by CMS originating from chart reviews and health risk assessments, yet the Company only enrolled 22% of total MA Plan Members.  Further, when looking at just health risk assessments in 2017, the Company generated 58% ($1.5 billion of $2.6 billion) of all payments made by CMS resulting from health risk assessments.  UnitedHealth received 66.6% of all payments made by CMS in 2017 resulting from diagnoses reported from only in-home HRAs and no other records.  The 2021 OIG Report concluded it was "unusual that one company accounted for such a substantially higher share of the [Members] with these

---

[8] U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., OEI-03-17-00474, Medicare Advantage Appeal Outcomes and Audit Findings Raise Concerns About Service and Payment Denials (Sept. 2021), https://oig.hhs.gov/documents/evaluation/2794/OEI-03-17-00474-Complete%20Report.pdf (last visited Dec.5, 2025).

[9] The OIG report did not specifically mention UnitedHealth by name, however, shortly after the 2021 OIG report was published, *The Wall Street Journal* and other media outlets published articles confirming that UnitedHealth was in fact the company referenced in the 2021 OIG Report.

diagnoses." The 2021 OIG Report recommended CMS perform additional oversight over UnitedHealth to determine the propriety of the payments made by CMS to the Company.

72.    Throughout the Relevant Period, in furtherance of the CMS Fraud Scheme, UnitedHealth implemented a carefully orchestrated three-step process to get its doctors (employed through Optum), to "find" additional diagnosis codes to add to Members' medical records. The process was revealed through investigative reporting published in *The Examiner News* on March 18, 2024, in an article titled: "Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum" (the "March 2024 Examiner News Article").

### (1)    Step One: HouseCalls Program

73.    UnitedHealth carried out the first part of its CMS Fraud Scheme through its "HouseCalls" program, wherein UnitedHealth dispatches nurse practitioners to Members' homes to perform medical assessments with the stated goal of identifying "gaps in care." One of the stated purposes for the HouseCalls program is for Members to receive some of their annual and preventive care at their place of residence. The reality is much more nefarious; UnitedHealth used the HouseCalls program to create new diagnosis codes for Members to increase their respective risk scores, even if they were not medically warranted. This in turn increased CMS's payments to UnitedHealth for its Medicare Advantage Members.

74.    The HouseCalls assessments are limited in scope—consisting primarily of a relatively brief interview with the Member by a nurse practitioner who would then complete an online questionnaire that included a lengthy checklist of potential diagnoses.

Although HouseCalls nurses are prohibited from providing direct medical care or ordering further diagnostic testing, the program allowed them to enter unverified diagnoses into Members' medical records.  As a result, any diagnoses HouseCalls nurses made were unverified at best.

75.    Optum executives would train nurses on how to add additional diagnosis codes when conducting chart reviews by resurrecting Members' prior conditions and marking them as an active problem.  In fact, and as revealed in a March 2024 *Examiner News* article, there are audio recordings of Optum executives coaching nurses to upcode by utilizing "buddy codes"—a practice in which additional diagnoses are added to Members' charts based purely on Members' existing diagnoses as opposed to an actual separate condition uncovered by a medical professional.

76.    HouseCalls nurses were required to use a Company-issued laptop with pre-loaded software calibrated to maximize the number of diagnoses for additional MA payments.  According to a July 8, 2024, story in *The Wall Street Journal* titled "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated" (the "July 8 WSJ Article"), the HouseCalls software recommended to nurses "what illnesses a patient might have and even adds some automatically to a 'diagnosis chart.'"  In essence, the HouseCalls software controlled the medical care that each Member received during a HouseCalls visit, and the attending nurse was reduced to nothing more than the equivalent of an 'order taker.' The July 8 WSJ Article also revealed that UnitedHealth utilized its HouseCalls program to inflate diagnoses by including conditions that Members were not treated for—contradicting the Members' own doctors' assessments, or that were simply incorrect.

77.    As an example, according to the July 8 WSJ Article, less than 17% of UnitedHealthcare Medicare Advantage Members diagnosed with HIV from 2018 to 2021 received the recommended antiretroviral drug treatment.  The fact that UnitedHealth was not providing antiretroviral drugs to 89% of Medicare Advantage Members diagnosed with HIV means that either (i) UnitedHealth was preventing those Members from receiving life-saving medication or (ii) that 89% of those Members never actually had HIV to begin with. Every MA Member diagnosed with HIV yielded UnitedHealth an extra $3,000 in CMS payments per year per member.  According to *The Wall Street Journal*, UnitedHealth-driven high-value diagnoses that no doctor treated generated ***$8.7 billion*** in CMS payments to the Company in 2021 alone, representing over 50% of the Company's 2021 net income of $17 billion.

78.    During an in-home HRA, UnitedHealth also required HouseCalls nurses to use an unproven diagnostic device called QuantaFlo; the primary purpose of QuantaFlo was to detect indicators for peripheral artery disease.  UnitedHealth would rely on QuantaFlo tests administered to Members as the primary basis for diagnosing peripheral artery disease, as opposed to using it for the device's intended purpose as a preliminary tool to determine whether additional diagnostics and visits with the appropriate medical providers were warranted.  Simply, the Food and Drug Administration ("FDA") had not approved QuantaFlo as an effective stand-alone diagnostic tool, yet this is exactly how UnitedHealth was implementing it in its HouseCalls program.  The end-result was clear: UnitedHealth required HouseCalls nurses to use a diagnostic tool, QuantaFlo, outside of the approved uses of the tool in order to generate additional medical diagnoses for its

Medicare Advantage Members, thereby improperly increasing their risk scores and fraudulently increasing CMS Medicare Advantage payments to UnitedHealth.

79.    Indeed, there have been a slew of investigative reports describing the unreliability and inaccuracy of the QuantaFlo device, such as how it consistently returns false diagnoses of peripheral artery disease, and how UnitedHealth relied on QuantaFlo to increase its risk-adjusted payments. For example, according to an article published in *The Wall Street Journal* on August 4, 2024, titled "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare" (the "August 4 WSJ Article"), a HouseCalls nurse reported concerns with the QuantaFlo device to UnitedHealth after receiving mixed results when testing it on herself but was told by UnitedHealth to keep using the device. The August 4 WSJ Article revealed a shocking statistic: UnitedHealth diagnosed peripheral artery disease 568,000 times after in-home visits between 2019 and 2021, yielding $1.4 billion in MA payments, while all other MA Plans with other insurers, collectively, only obtained $446 million for the same diagnosis.

80.    Then, on August 7, 2024, *STAT News* published an investigative report titled: "How UnitedHealth Turned a Questionable Artery-Screening Program Into a Gold Mine" (the "August 7 Stat News Article"). The August 7 STAT News Article reported that UnitedHealth-owned clinics were directed by the Company to utilize the QuantaFlo device on MA Members because "it will not only identify undiagnosed peripheral artery disease, but also increase patients' risk scores," which would allow the Company to "tap into a sea of revenue."

81.     On April 16, 2025, *STAT News* published a follow-up article about QuantaFlo and UnitedHealth titled, "Device maker that helped UnitedHealth  collect billions offers to settle fraud claims with DOJ" (the "April 2025 STAT News Article"), revealing that many medical providers that treated MA Members believed that QuantaFlo was "useless," UnitedHealth nonetheless continued to require QuantaFlo during its HouseCalls process for Medicare Advantage Members.  According to the April 2025 STAT News Article, UnitedHealth generated billions of dollars in revenue from questionable peripheral artery disease diagnoses generated by QuantaFlo.

82.     Semler, the company that manufactures and markets QuantaFlo, is now in the process of exiting the medical device business altogether and pivoting the entire company to become a Bitcoin Treasury company.  On June 24, 2025, *STAT News* reported Semler Chairman, Eric Semler, as stating "[Semler] is a bitcoin-first company."  Then, on August 4, 2025, Semler announced that it booked a litigation contingency liability of $29.75 million on June 30, 2025, in anticipation of a forthcoming Medicare fraud settlement with the DOJ and related to the improper use of QuantaFlo.

83.     Despite QuantaFlo's inability to reliably and accurately diagnose peripheral artery disease—and QuantaFlo diagnoses were rarely, if ever, confirmed by clinical tests— UnitedHealth utilized the results to artificially inflate the CMS payments it received for the Company's MA Members.

84.     The August 4 WSJ Article further revealed HouseCalls software pushed HouseCalls nurses towards certain, often rare, diagnoses if a Member had a specific medical history, even though the HouseCalls nurses were not required to confirm the

diagnosis with a lab test.  The August 4 WSJ Article further noted that UnitedHealth had the highest average payment per Member among *all* MA insurers ($2,735 for in-home diagnoses per visit from 2019 to 2021).

### (2)    Step Two: UnitedHealth Used Offshore Coders to Pressure Health Providers

85.    As the second prong of the CMS Fraud Scheme, UnitedHealth had internal reviewers from UnitedHealth's quality assurance team ("Reviewers") examine the online questionnaires that were completed during the HouseCalls visits to make sure that all possible diagnosis codes were recorded.  After reviewing a HouseCalls questionnaire, if Reviewers found that if not all possible medical diagnoses had been exhaustively selected by the HouseCalls nurse, UnitedHealth would have Reviewers employ high-pressure tactics to revise the HouseCalls record and add additional diagnoses to Members' medical records.  A HouseCalls nurse's failure to follow Reviewers' instructions could lead to the nurse's termination.

86.    According to the March 2024 Examiner News Article, after a subsequent primary care-doctor follow-up, a UnitedHealth risk-adjustment coder, "usually offshore in India," would add a code in a "super shady" manner that related to the diagnoses previously added by the nurse but not addressed by the primary healthcare provider.  Alternatively, the risk adjustment coder could opt to contact the medical provider directly, pressuring them to add previously "undiagnosed" diagnosis codes.  More specifically, risk-adjustment coders were tasked with locating conditions that could be linked to potential complications—thus raising the Members' risk adjustment scores—even if a diagnoses

code was unsupported.  Risk-adjustment coders' job performance was predominantly measured and incentivized by how much upcoding they achieved.

### (3)    Step Three: UnitedHealth Acquires Medical Practices, Then Pressures Providers to Upcode

87.    Since at least 2020, UnitedHealth has been on a nonstop buying spree of medical practices, acquiring hospitals, doctors' offices, and medical clinics across the United States, ultimately employing one in ten physicians in America.  Shortly after UnitedHealth acquires any given medical practice, the Company systematically changes doctor performance evaluations to be based, in part, on how many conditions its doctors diagnose.  According to a July 25, 2024 article published in *STAT News*, titled: "How UnitedHealth harnesses its physician empire to squeeze profits out of patients," the Company would pressure its medical providers within the Company's vast orbit to document as many ailments as possible.  As an incentive, UnitedHealth offered lucrative bonuses to its providers, in some cases up to $30,000 annually.  When incentives did not work, the Company would reprimand providers who did not meet the Company's coding expectations.  One indicator of UnitedHealth's active and systemic role in over-diagnosing its MA Members is that its MA Members were diagnosed with lung disorders, vascular conditions, and kidney disease at more than twice the rate of persons enrolled in the traditional Medicare program (not on a Medicare Advantage plan).

88.    On October 16, 2024, *STAT News* published a follow-up article titled, "Inside UnitedHealth's strategy to pressure physicians: $10,000 bonuses and a doctor leaderboard" (the "October 2024 STAT News Article"); the October 2024 STAT News Article further

described UnitedHealth's practice of pressuring doctors to find more chronic illnesses in Medicare Advantage Members that could be utilized to increase payments. According to the October 2024 STAT News Article, UnitedHealth utilized a variety of pressure tactics, including paying bonuses (up to $10,000) and utilizing competitive dashboards, which compared doctors' diagnosis rates against their peers. The October 2024 STAT News Article also noted that at UnitedHealth-owned medical clinics, doctors diagnosed peripheral artery disease in 47% of MA patients—a rate three to four times higher than typical prevalence in older Americans. The October 2024 STAT News Article also described how UnitedHealth physicians across the country reported intense pressure from the Company to increase patient risk scores and noted that doctors who did not code sufficient diagnoses were sent to remedial training. Another notable practice illustrating UnitedHealth's CMS Fraud Scheme was its pervasive diagnosis of HIV—a diagnosis code that significantly increases a Medicare Advantage Members' risk score and associated payments from CMS.

### D. UnitedHealth Misrepresented Internal Data Firewalls Related to the Company's Acquisition of Change Healthcare

#### i. The 2022 DOJ Antitrust Suit and UnitedHealth's Data Governance

89.    On January 6, 2021, UnitedHealth, through its Optum unit, announced a $13 billion agreement to acquire Change Healthcare, the largest healthcare EDI clearinghouse in the United States; at the time, Change Healthcare processed over 15 billion medical transactions annually. Acquiring Change Healthcare gave UnitedHealth extraordinary

access to CSI from virtually every major healthcare payer and provider in the United States, including many of the Company's rivals.

90.     The announcement of the Change Acquisition immediately triggered antitrust concerns.  On March 17, 2021, the American Hospital Association ("AHA") wrote a public letter to the Antitrust Division of the DOJ (the "2021 AHA Letter") expressing concern that the Change Acquisition would give UnitedHealth unprecedented access to a large portion of the country's healthcare data.  AHA took the position that the Change Acquisition would stifle competition for the sale of healthcare information services to other providers and questioned UnitedHealth's—and by extension, Optum's—purported "firewalls."  On the issue of firewalls, the AHA pointed out that the Company "has never demonstrated that the firewalls are sufficiently robust to prevent sensitive and strategic information sharing."

91.     On February 24, 2022, the DOJ, along with attorney's general for Minnesota and New York, filed a lawsuit to block the Change Acquisition (the "2022 DOJ Antitrust Suit").[10]  The DOJ argued in the 2022 DOJ Antitrust Suit that the Change Acquisition would give UnitedHealth unprecedented access to highly sensitive information regarding nearly all U.S. health insurance companies and the health data for nearly all Americans, and it would also give the Company a near monopoly over EDI clearinghouse services and

_____

[10] *United States of America et al v. UnitedHealth Group Incorporated et al*, 1:22-cv-00481, (D. D.C., Feb. 24, 2022).

claims editing—the two most critical processes in the commercial health insurance industry.[11]

92.     In support of the 2022 DOJ Antitrust Suit, then-Attorney General Merrick B. Garland stated:

> If America's largest health insurer is permitted to acquire a major rival for critical health care claims technologies, it would undermine competition for health insurance and stifle innovation in the employer health insurance markets. The DOJ is committed to challenging anticompetitive mergers, particularly those at the intersection of health care and data.

93.     To overcome government opposition and to reassure the public, UnitedHealth claimed it had robust internal firewalls to prevent inappropriate access or misuse of competitor data.  For example, in court filings and public statements made in March and July 2022, the Company asserted that its information technology systems featured "advanced and sophisticated" firewall infrastructure and "strict limitations" on the use of external customer data.

94.     UnitedHealth's representations to the government and to the public about the effectiveness and security of its information technology systems, and more specifically of its firewalls, allowed the Company to overcome antitrust challenges to the Change Acquisition.  On September 19, 2022, UnitedHealth prevailed in the 2022 DOJ Antitrust Suit, when the United States District Court for the District of Columbia made findings in

---

[11] Claims editing is the process of reviewing and correcting health insurance claims prior to their submission for payment. The process ensures compliance with industry standards, regulations, and payer-specific requirements.

favor of UnitedHealth.[12]  In its Order and Opinion, the Court specifically credited the Company's claimed history of maintaining data firewalls and policies prohibiting anti-competitive behavior.

95.    The truth, however, was that UnitedHealth's claimed technological safeguards and anti-competition prohibitions did not exist; UnitedHealth simply did not possess the protections it promised the government and the public.  As a specific example, UnitedHealth subsidiary Optum did not have business systems with proper role-based access controls nor appropriate technical firewalls for several of its enterprise software applications including ContractHub, Salesforce GO, and BIGW.[13]  As a result, employees from one Optum or UnitedHealth business could freely access sensitive data from other business units within the Company.

96.    Optum's inadequate technical firewalls meant that any unauthorized access and/or data breaches could not be isolated, meaning that if a bad actor was successful in

---

[12] *See United States v. UnitedHealth Grp. Inc.,* 630 F. Supp. 3d 118 (D.D.C. 2022), *dismissed*, No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023).

[13] ContractHub is the contract repository for all of Optum's commercial contracts (CSI stored in ContractHub includes pricing information and contract terms and conditions) and lacked role-based security protocols sufficient to prevent users from one Optum business accessing data from another Optum business.  "Salesforce GO" is the sales customer relationship manager used to track and report sales activity (CSI stored in Salesforce GO includes pricing information) and did not have in place role-based security protocols sufficient to prevent users from observing all past and current sales activity for all Optum customers, which would include Change customers.  BIGW is the data warehouse that receives data from many systems, including ContractHub, Salesforce GO, Peoplesoft Enterprise Resource Planning Tool ("Peoplesoft ERP") and the Change Healthcare Enterprise Data Warehouse (CSI stored in BIGW includes volumes of transactions and accounting status), and did not have in place role-based security protocols sufficient to prevent users from one Optum business accessing data from another Optum business.

breaching one of Optum's software applications could then gain unrestricted access to *all* of Optum's data and systems. Additionally, because Change Healthcare's customers included UnitedHealth competitors, after the Change Acquisition was completed, UnitedHealth gained a significant unfair advantage over its competition when Company employees across different UnitedHealth business units could improperly access competitor information.

97. Two weeks after shedding the 2022 DOJ Antitrust Suit, UnitedHealth announced that the Change Acquisition was completed on October 3, 2022.

98. In late 2022 and throughout 2023, UnitedHealth's Integration Management Officer provided the Company's officers and directors, including Defendants Witty and Hemsley, with internal reports that flagged these security lapses. Applications such as Peoplesoft ERP did not have role-based security until Fall 2023, long after the acquisition closed. In another example, the Consumer Database ("CDB")—used jointly by UnitedHealthcare and Optum—failed to properly apply "Line of Business" tags, leading to documented breaches where UnitedHealth employees viewed restricted data. The CDB failures were documented in a September 2023 internal report, but they were not fixed until October 2024, more than a year later.

### ii. The Change Data Breach

99. Less than eighteen months after the Change Acquisition was completed, on February 22, 2024, UnitedHealth disclosed that Change Healthcare had suffered the largest data breach in U.S. history, affecting over 190 million patients. The Change Data Breach exposed social security numbers, diagnoses, and billing information.

100.    The Change Data Breach is attributed to UnitedHealth's failure to implement basic safeguards like multi-factor authentication.    Change Healthcare's information security system at the time of the Change Data Breach allowed full access to Change Healthcare's computer systems with only an email address and a password.    The perpetrators responsible for the Change Data Breach simply obtained login credentials and gained unrestricted access to a massive database of the Country's most sensitive information.  Worse, the Change Data Breach went undetected by UnitedHealth for ***nine days***—providing plenty of time for the hackers to access, download, and duplicate patient data.

101.    The Change Data Breach subjected UnitedHealth to heightened scrutiny by the government, the media, and the American public.  Congressional hearings were held on May 1, 2024 to discuss the Change Data breach and its implications.  At the Senate Committee hearing, Senator Warren called UnitedHealth "so damn big," while at the House of Representatives hearing, Representative Carter argued that the Company "needs to be busted up."

### E.  The Individual Defendants Caused the Company to Issue Materially Misleading Statements

102.    Throughout the Relevant Period, the Individual Defendants made, or caused UnitedHealth to make, materially false and/or misleading statements, and failed to disclose material adverse facts regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants misled stockholders by failing to disclose that: (i) UnitedHealth was engaged in a company-wide scheme to fraudulently inflate revenues

under its Medicare Advantage plans; and (ii) the Company had misrepresented the efficacy of internal data firewalls related to the Company's acquisition of Change Healthcare in order to defeat antitrust scrutiny and to gain an unfair competitive advantage.

### i. UnitedHealth's CMS Fraud Scheme

103.   Beginning on or around September 22, 2021, the Individual Defendants made numerous public statements touting the effectiveness, compliance, and clinical integrity of its HouseCalls and MA programs: these statements were materially false and misleading.  The Company made representations in a variety of forums, including in the Company's filings with the SEC, during quarterly earnings calls, and at investor conferences.  The Company's representations consistently portrayed HouseCalls as a beneficial clinical service improving patient outcomes and the Company's MA billing practices as appropriate.  In reality, UnitedHealth was unlawfully increasing MA payments from CMS using in-home HRAs conducted by HouseCalls nurses, retroactive chart reviews, and provider pressure tactics to generate diagnosis codes for conditions that were not based on medical necessity or that any doctor ever treated.

104.   On September 22, 2021, *The Wall Street Journal* published its article titled "Most of $9.2 Billion in Questionable Medicare Payments Went to 20 Insurers, Investigators Say" (the "September 2021 WSJ Article").  The September 2021 WSJ Article discussed the 2021 OIG report that found UnitedHealth had received nearly half of a $9.2 billion pool of suspicious Medicare payments from CMS.  According to the September 2021 WSJ Article:

Among the 20 companies flagged in the [2021 OIG Report], the investigators found that one [company] received approximately 40% of the questionable payments, or $3.7 billion, while enrolling only 22% of Medicare Advantage customers. The [2021 OIG Report] didn't name the company. Federal data compiled by analysts at BMO Capital Markets shows that enrollment share closely matched that of industry giant UnitedHealth Group Inc.'s UnitedHealthcare during the period covered in the report.

105.    UnitedHealth provided an on-the-record statement for the September 2021 WSJ Article, denying any wrongdoing:

*UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care. Our Medicare Advantage risk-adjustment program is transparent and compliant with CMS rules.*

106.    On October 14, 2021, UnitedHealth held its Q3 2021 earnings call to discuss its financial performance for Q3 2021.  UnitedHealth was represented on the Q3 2021 earnings call by Defendants McMahon, Rex, Cianfrocco, and former CEO of UnitedHealthcare Brian Thompson ("Thompson") and then-CEO of OptumHealth Wyatt Decker ("Decker").

107.    During the question-and-answer portion of the Q3 2021 earnings call, analysts inquired about the financial impact of COVID-19 on MA risk-adjustments and about how the Company was performing in terms of completing in-home wellness visits compared to the previous year.  In response to this question, Thompson stated, in pertinent part:

*[W]e are encouraged by the encounters with the physicians, the primary care visits and annual wellness visits as well as in-home clinical visits. So those have been encouraging. So I certainly expect less of a headwind in 2022 due to those encounters, certainly getting traction certainly compared to 2021.*

108.    Also, during the Q3 2021 earnings call, an analyst with Barclay's raised a

question about the Company's Medicare Advantage business and the red flags raised in the

September 2021 WSJ Article, Defendant McMahon responded:

> [Barclay's Analyst]: So you touched on the topic of Medicare risk adjuster
> payments earlier. This was also a little bit more topical about a month ago
> with [the September 2021 WSJ Article] putting a spotlight on it. So I guess
> I'm just curious if you have any updated high-level thoughts on [Medicare
> risk-adjustment] payments conceptually for the managed care industry
> overall. And do you see any potential reform of [Medicare risk-adjustment]
> near term? Or do you expect status quo going forward?
>
> [Defendant McMahon]: . . . And when we think about the risk adjustment
> model in the payment system. The model has been critical to providing broad
> and equitable access to [Medicare Advantage]. ***Risk adjustment levels of
> playing field and ensures that there's no disincentive to care for the most
> vulnerable. So we really feel that it's an essential part of encouraging the
> right incentives in the program,*** and think it's something to build on and
> broadly support that we need to think about how to build these positive
> elements and aspects of the program for which this is one of them.

109.    On October 19, 2021, *The Minnesota Star Tribune* published an article titled:

"Report says UnitedHealth Group was top recipient of questionable Medicare payments"

(the "October 2021 Minnesota Star Tribune Article"). The October 2021 Minnesota Star

Tribune Article, like the September 2021 WSJ Article, discussed the September 2021 OIG

report, and also confirmed that, based on government documents that *The Minnesota Star

Tribune* had obtained, UnitedHealth was the company identified in the 2021 OIG Report

as the company that "covered 22% of all [members] enrolled in the health plans [reviewed

by the OIG] at the time, yet received a disproportionately high $3.7 billion, or 40% of the

total payments" in 2017.

110.    According to the October 2021 Minnesota Star Tribune Article, the 2021 OIG Report "found [that] UnitedHealth Group received 85% of all payments" based on in-home HRAs.  The October 2021 Minnesota Star Tribune Article further stated that "UnitedHealth Group accounted for two-thirds of all risk-adjusted payments resulting from diagnoses reported only on in-home [assessments] and no other service record."

111.    In response to the October 2021 Minnesota Star Tribune Article, UnitedHealth once again denied any wrongdoing, claiming that the 2021 OIG Report was "*based on old data and is inaccurate and misleading – disservice to seniors and an attack on the [federal government's] payment system*," and "*[i]n-home clinical care programs and chart reviews are needed for appropriate senior care and payment . . . . UnitedHealthcare's status as an early clinical home provider is not only appropriate, its best practice*."

112.    On November 3, 2021, UnitedHealth filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2021 (the "Q3 2021 10-Q").  The Q3 2021 10-Q, which was signed by Defendants Witty and Rex, stated that "*UnitedHealthcare's revenue increased due to growth in the number individuals served through Medicare Advantage and Medicaid, including a greater mix of people with higher acuity needs. . . .*"[14]

---

[14] The same false and misleading statement was also included in UnitedHealth's Q1 2022 Form 10-Q, filed on May 4, 2022; the Q2 2022 10-Q filed on August 3, 2022; the Q3 2022 Form 10-Q filed on November 2, 2022; the Q1 2023 10-Q filed on May 3, 2023; the Q2 2023 10-Q filed on August 2, 2023; and the Q3 2023 Form 10-Q filed on November 6, 2023. Each of the foregoing 10-Qs were signed by Defendants Witty and Rex.

113.    On November 30, 2021, UnitedHealth hosted its annual investor conference (the "2021 Investor Conference").  During the 2021 Investor Conference, Defendant Witty spoke about the purported benefits of HouseCalls, stating:

> Another is through [HouseCalls]. A true collaboration between Optum and UnitedHealthcare, where our clinicians help seniors in Medicare Advantage programs manage their chronic disease, close gaps in care and stay healthy and out of the hospital, our teams not only look after our members' medical needs, they help with any number of life challenges like keeping health food in the fridge or find an assistance with a utility bill.

114.    On January 19, 2022, UnitedHealth held its Q4 2021 and FY 2021 earnings call to discuss its financial performance for Q4 2021 and FY 2021 (the "FY 2021 Earnings Call").  UnitedHealth was represented on the Q4 2021 earnings call by Thompson and Defendants Witty, McMahon, Rex, Noel,[15] and Cianfrocco.  During the call, Defendant Witty discussed the Company's in-home visits program and its focus on patient care, stating:

> [O]ne of the things that I think we really are pleased about is the way in which OptumCare has developed a whole set of capabilities to deliver really enhanced focus on [Medicare Advantage] patients. Obviously, these patients have high medical need very often. They need high touch. I've been super impressed with the development, not just in the clinic, *but also through the at-home programs, where we're able to continue to make sure folks are looked after properly.*

115.    During the Q&A portion of the FY 2021 Earnings Call, in response to a question from an analyst with Stephens Inc. about the competitive landscape of the MA environment, Defendant Noel stated, in pertinent part:

---

[15] Noel is the current CEO of UnitedHealthcare (successor to Thompson, who died from a gunshot wound in New York City on December 4, 2024.).

And for our part, [UnitedHealth is] really focused on differentiating our offerings in the marketplace. And what we're doing is we're driving things, not only around benefits, but also around capabilities. Better digital tools, ease of payment, product innovation, better and more personalized service experiences, better clinical quality, more value-based and aligned care provider relationships are all part of that.

116.   Also during the Q&A portion of the FY 2021 Earnings Call, in response to a question from an analyst with Bank of America Merrill Lynch about margins in the MA business, Defendant Witty stated, in reference to the Company's MA Insurance business and its healthcare services business, "So I think it's a well-established and highly successful separation between the two businesses, which has performed extremely well."

117.   On February 15, 2022, UnitedHealth filed its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Witty, Rex, Hemsley, Flynn, Garcia, Hooper, McNabb, Rice, and Noseworthy.

118.   Under the section titled "UnitedHealthcare Medicare & Retirement," the 2021 10-K states, in pertinent part to the Company's Medicare Advantage program:

> *Medicare Advantage*. . . . Under the Medicare Advantage program, UnitedHealthcare Medicare & Retirement provides health insurance coverage in exchange for a fixed monthly premium per member from CMS plus, in some cases, monthly consumer premiums. ***Premium amounts received from CMS vary based on the geographic areas in which individuals reside; demographics factors such as age, gender and institutionalized status; and the health status of the individual.***[16]

---

[16] The same statement was also included in UnitedHealth's Annual Report filed with the SEC on February 24, 2023 on Form 10-K for fiscal year 2022, which was also signed by Defendant Witty.

119.    Also, under the "UnitedHealthcare Medicare & Retirement" section, the 2021 10-K addressed the Company's HouseCalls service, stating in pertinent part:

UnitedHealthcare Medicare & Retirement's senior-focused care management model operates at a medical cost level below traditional Medicare, while helping seniors live healthier lives. We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care. ***For example, through our HouseCalls program, nurse practitioners performed more than 2.1 million clinical preventative home care visits in 2021 to address unmet care opportunities and close gaps in care.***

120.    The 2021 10-K also included information on premium revenues from CMS, stating "***Premium revenues from CMS represented 36% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2021, most of which were generated by UnitedHealthcare Medicare & Retirement.***"

121.    On April 14, 2022, the Company hosted its Q1 2022 earnings call (the "Q1 2022 Earnings Call") with investors to discuss the Company's financial performance for Q1 2022.   UnitedHealth was represented on the Q1 2022 Earnings Call by Defendants Witty, McMahon, Rex, Noel, and Cianfrocco.

122.    During the call, Defendant Noel stated in pertinent part:

In-home testing is certainly a huge area of focus for us. . .. [M]ore recently, we've really been focused on reaching out to people that we know to be underdiagnosed for conditions like hep C and diabetes. And in doing this, ***we've reached out over the last year to about 1 million members who we suspect to be underdiagnosed and offering in-home testing solutions that are then delivered by our HouseCalls partners over at Optum. These completion rates have been really promising, 35% last year, and we'll continue to evaluate expanding this program***. That will do a really nice job of helping us understand where conditions are underdiagnosed and can be better treated.

123.    On May 10, 2022, UnitedHealth participated in Bank of America Healthcare Conference 2022, during which the Company participated in an investor conference call (the "2022 BOA Healthcare Call").  During the 2022 BOA Healthcare Call, Defendant Cianfrocco discussed the value of the HouseCalls program to UnitedHealth's business model:

> So another great example is even go back beyond and you think about the beginnings of our home and community base, think about HouseCalls, which we've talked about for years. *I remember when HouseCalls was doing a couple of hundred thousand annual visits a year. Today, it is really the backbone of a home and community-based program that brings more value to the system, helps consumers, service people in their home, puts together capabilities that will keep driving value, and we'll continue to grow and drive value to all of our payers and clients*.

124.    On July 15, 2022, the Company hosted its Q2 2022 earnings call (the "Q2 2022 Earnings Call") with investors to discuss the Company's financial performance for Q2 2022.  UnitedHealth was represented on the Q2 2022 Earnings Call by Defendants Witty, McMahon, Rex, Noel, and Cianfrocco.

125.    During the Q2 2022 Earnings Call Defendant Witty discussed the purported benefits of HouseCalls to Medicare patients, stating: "***And as you know, we've got a long history in this in areas like HouseCalls, which have delivered amazing health assessment and preventative direction to millions of people, and this is another big step for us to extend.***"

126.    Also, during the Q2 2022 Earnings Call, Defendant Rex stated that the HouseCalls annual wellness assessments for the Company's Medicare patients was "***very important for us in getting them the care they need" and "[w]e got to make sure people***

*are getting the care that they need. We've seen the greatest response really in our senior populations. I think some of that is our ability to get into their homes to influence that care and to get them into that.*"

127.    On November 29, 2022, UnitedHealth held its annual investor conference (the "2022 Investor Conference").  During the 2022 Investor Conference, Robert Hunter ("Hunter"), then-Senior Vice President of UnitedHealthcare's Medicare Advantage Product & Experience division, stated: "House[Calls] has been the centerpiece of our home care model for government programs for years."  Hunter further added:

> *We expect to complete 2.2. million house calls this year, bringing personalized care into the home to address both immediate and preventative medical care needs in addition to social needs, including access to healthy food, safe housing, transportation and medical appointments and more. We have been testing people for underdiagnosed conditions such as diabetes, prediabetes, hep C and colon cancer. And what we found is nearly 1 out of every 4 people we screened had a condition they didn't realize they had and the hep C positivity rates for dual special needs members are nearly double the national average.*

128.    On January 13, 2023, the Company hosted its Q4 2022 and FY 2022 earnings call (the "FY 2022 Earnings Call") with investors to discuss the Company's financial performance for FY 2022.  UnitedHealth was represented on the FY 2022 Earnings Call by Defendant Witty, Defendants McMahon, Rex, Cianfrocco, Noel, and then-CEO of UnitedHealthcare Employer and Individual, Dan Keuter ("Keuter").

129.    During the FY 2022 Earnings Call, Defendant McMahon spoke about the Company's HouseCalls program, stating in pertinent part:

> *[W]e continue to expand the range of clinical services we provide via our HouseCalls initiative. In 2023, we will increase the types of vaccinations offered, expand testing services and deploy even more real-time resources*

*to address social determinants of health. Seniors place high value on being able to get care in their home.*

130.    On February 24, 2023, UnitedHealth filed its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2022 (the "2022 10-K").  The 2022 10-K was signed by Defendants Witty, Rex, Hemsley, Flynn, Garcia, Gil, Hooper, McNabb, Rice, and Noseworthy.

131.    Under the section titled "UnitedHealthcare Medicare & Retirement," the 2022 10-K stated the following regarding HouseCalls:

> We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care. ***For example, through our HouseCalls program, nurse practitioners performed nearly 2.3 million clinical preventative home care visits in 2022 to address unmet care opportunities and close gaps in care.***

132.    The 2022 10-K also discussed premium revenues from CMS, stating: "***Premium revenues from CMS represent 38% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2022, most of which were generated by UnitedHealthcare Medicare & Retirement***."

133.    On April 14, 2023, the Company hosted its Q1 2023 earnings call (the "Q1 2023 Earnings Call") with investors to discuss the Company's financial performance for Q1 2023.  UnitedHealth was represented on the Q1 2023 Earnings Call by Defendants Witty, McMahon, Rex, and Cianfrocco.  During the Q1 2023 Earnings Call, Defendant Witty stated, in pertinent part during his prepared remarks:

> *We are committed to working with CMS as stewards of the MA program, especially with its long-stated goal of promoting value-based care, which remains the best solution to promote equitable access, better*

> *healthcare outcomes, exceptional experiences and lower cost for the system.*

134. Defendant McMahon, during his prepared remarks, discussed the Company's HouseCalls program, stating in pertinent part:

> *First, patient assessments, in-home clinical visits designed to identify care needs and help patients with other physical and social needs. This year, we expect to make more than 2.5 million visits to patients' homes and we continue to expand the scope of the clinical services offered in that setting.*

135. On July 14, 2023, the Company hosted its Q2 2023 earnings call (the "Q2 2023 Earnings Call") with investors to discuss the Company's financial performance for Q2 2023. UnitedHealth was represented on the Q2 2023 earnings call by Defendants Witty, McMahon, Rex, and Noel. During the Q2 2023 Earnings Call, Defendant Witty discussed HouseCalls, stating in pertinent part:

> Last month, researchers at Yale Medicine, working in collaboration with Optum, published a peer-reviewed study about in-home visits, an important element in our value-based care approach. *The study found patients who received our in-home preventative wellness assessments compared with those who hadn't made fewer emergency department visits and spent fewer nights in hospitals across 4 common conditions: depression, hypertension, coronary artery disease and type 2 diabetes.* They also experienced reduced wait times for follow-up care.

136. On November 29, 2023, UnitedHealth held its annual investor conference (the "2023 Investor Conference"). During the 2023 Investor Conference, Hunter, discussed HouseCalls, stating in pertinent part: "*This year, we will conduct more than 2.5 million in-home visits through our HouseCalls program, completing approximately 200,000 tests for diabetes and hep C, which are consistently underdiagnosed conditions,*" and

*"[t]his year, we will screen nearly 3.8 million people, helping connect them to necessary resources with over 40% of those screenings occurring during a HouseCalls visit*."

137.    Defendant Witty also made statements about the Company's Medicare Advantage program during the 2023 Investor Conference, stating in pertinent part:

A good example this year, the rate notice or Medicare Advantage earlier this year, a significant change in the funding outlook for the future from Medicare Advantage. That rate notice has a material impact in terms of revenues associated with our Medicare Advantage portfolio. And as you can see, that ripples through the metrics of the organization as revenues, essentially a price cut for Medicare Advantage occurs, you see that pattern flow through the business.

*And yet here we are today standing up and saying, despite that change, despite that impact, we are committed to the kind of earnings growth rate over the next 12 months that you would expect from us even if there hadn't been a rate notice cut. And the reason for that is we spent the last 6 months, reconfiguring our plans for the next year and 2 and 3 and 5 years in response to the change in circumstance.* We focused on how we can protect members and their benefits. We focused on how we can take more cost and efficiency into our organization, and we focused on how we can double down on eliminating waste and unnecessary care in the health system more generally.

We've used that adverse event in terms of the rate notice change as a stimulus, as a catalyst, as a way to make us rethink and redouble our energies around the things we've always believed, that we'll put our members first, that we will strive to be the most efficient health care delivery organization in the country and that we will focus on delivering true value-based care.

138.    Thompson also shared remarks about the Company's Medicare Advantage program during the 2023 Investor Conference, stating in pertinent part:

When you compare it to fee-for-service, people in our fully accountable MA arrangements with Optum experience better complex care management. *Their Medicare Advantage patients were 44% less likely to be admitted into a hospital for COPD or asthma and had a 10% lower rate of admission for stroke or heart attack. They also had 14% fewer avoidable emergency department visits. They also had lower admissions. Their patients were*

*18% less likely to have an inpatient admission and 9% fewer readmissions to the hospital within 30 days.* And they had better engagement with their health, over 31% higher rates of annual wellness visits.

139.    Also, during the 2023 Investor Conference, Defendant Noel stated, in pertinent part:

> Let me share a little bit about the Medicare Advantage program and how we are leaning deeper into senior-focused, value-based care.
>
> *    *    *
>
> [C]ompared with traditional fee-for-service Medicare, seniors in Medicare Advantage saved 45% on out-of-pocket cost each year, which is especially important to the 52% of participants who live on an annual income of less than $25,000. In total, these savings when paired with those of the government saves the health system more than 12%. Consumers in Medicare Advantage also experienced better health outcomes across a broad range of measures, including more preventative care visits and fewer hospital visits.

140.    The Company filed its SEC Form 10-K for the fiscal year ended December 31, 2023 on February 28, 2024 (the "2023 10-K"). The 2023 10-K, which was signed by Defendants Witty, Rex, Hemsley, Baker, Flynn, Garcia, Gil, Hooper, McNabb, Rice, and Noseworthy reported on HouseCalls, stating in pertinent part:

> We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care. *For example, through our HouseCalls program, nurse practitioners performed more than 2.7 million clinical preventive home care visits in 2023 to address unmet care opportunities and close gaps in care.*

141.    On April 16, 2024, the Company held its Q1 2024 earnings call ("Q1 2024 Earnings Call") with investors to discuss the Company's financial performance for Q1 2024. UnitedHealth was represented on the Q1 2024 Earnings Call by Defendants Witty, Rex, Noel, and Cianfrocco. During the Q1 2024 Earnings Call, Defendant Witty discussed

the value of UnitedHealth's HouseCalls program to both Medicare Advantage consumers and taxpayers, stating in pertinent part:

> [Medicare Advantage] drives better health outcomes; provides a higher value, significantly more comprehensive benefit for people, all at a lower cost to beneficiaries and taxpayers; and is more popular with and valuable to seniors than traditional Medicare.

142. On July 16, 2024, the Company held its Q2 2024 earnings call ("Q2 2024 Earnings Call") with investors to discuss the Company's financial performance for Q2 2024. UnitedHealth was represented on the Q2 2024 Earnings Call by Defendants Witty, Rex, Noel, and Cianfrocco. During the Q2 2024 Earnings Call, Defendant Witty discussed the value of UnitedHealth's HouseCalls program to both Medicare Advantage consumers and taxpayers, stating in pertinent part:

> The home visits we offer seniors further illustrate the value of MA. Last year, our medical professionals made more than 2.5 million home visits. ***As a direct result, our clinicians identified 300,000 seniors with emerging health needs that may otherwise have gone undiagnosed. They connected more than 500,000 seniors to essential resources to help them with unaddressed needs such as food and security, medication affordability, transportation, and financial support. They also identified and helped close more than three million gaps in care that made a real difference in people's lives. Within 90 days of one of our home visits, 75% of patients received follow-up in a clinical setting.***
>
> ***Additionally, Medicare Advantage patients with chronic conditions who receive these home visits end up with better managed and more stable health outcomes, as evidenced by spending measurably less time than fee-for-service patients in emergency room and other hospital settings.*** The bottom line, our home visit programs help patients live healthier lives and save taxpayers' money. It is only Medicare Advantage that makes programs and results like this possible.

143. The Company filed its SEC Form 10-K for the fiscal year ended December 31, 2024, on February 27, 2025 (the "2024 10-K"). The 2024 10-K, which was signed by

Defendants Witty, Rex, Hemsley, Baker, Flynn, Garcia, Gil, Hooper, McNabb, Rice, and

Noseworthy, reported on HouseCalls, stating in pertinent part:

> As a result of continued portfolio refinement, the Company sold other businesses and assets and entered into strategic transactions. These transactions resulted in total consideration received of $3.0 billion and an additional $1.9 billion of equity method investments related to the valuation of our retained interests in certain transactions. The carrying value for these transactions was $1.0 billion, primarily related to goodwill. The gains from business portfolio refinement, including strategic transactions, were recorded within operating costs in the Consolidated Statement of Operations and contributed about 80 basis points ($3.3 billion) to the operating cost ratio, nearly half ($1.4 billion) related to Optum Health with the remainder split between UnitedHealthcare ($1.1 billion) and Optum Insight ($800 million). Certain transactions also included various put and call options, which were valued at $630 million and included in other liabilities on the Consolidated Balance Sheet. As of December 31, 2024 the total estimated future obligation under these arrangements if the Company decided or was required to repurchase these interests was up to $3.4 billion.

144.   The above statements were materially false and misleading when made.  The

Individual Defendants, in their roles as directors and high-level officers of the Company,

would have been in a position to know that rather than helping patients, UnitedHealth was

using in-home health risk assessments conducted by HouseCalls nurses, retroactive chart

reviews, and provider pressure tactics to generate diagnosis codes for conditions that were

not based on medical necessity or that no doctor treated so as to increase Medicare

Advantage payments.  As a result, UnitedHealth had the highest average payments among

Medicare Advantage insurers for in-home diagnosis per visit from 2019 to 2021.  In fact,

in 2021 alone, UnitedHealth brought in *$8.7 billion* in payments from CMS for diagnoses

that no doctor ultimately treated, which represented over 50% of the Company's net

income.  And in 2023, the Company brought in $3.2 billion in Medicare Advantage

payments from diagnoses reported only on in-home health risk assessments and health risk assessment-linked chart reviews—totaling two-thirds of the total risk adjusted payments CMS made to insurers in 2023 based on these same diagnostic methods.

### ii. The Efficacy of Internal Firewalls at UnitedHealth, Optum, and Change Healthcare

145.   Beginning in at least February 2022, the Individual Defendants also made, or caused UnitedHealth to make, repeated public statements assuring investors, regulators, and the courts that the Company maintained robust internal data controls—specifically, "advanced and sophisticated" firewall protections—to prevent the misuse of CSI following its acquisition of Change Healthcare.  These statements were made in SEC filings, court pleadings, press releases, and investor calls during the Relevant Period.  At the time these statements were made, Optum lacked sufficient technical firewalls, role-based security protocols, and governance frameworks to enforce data segregation.

146.   On February 24, 2022, Optum published a "fact sheet," defending the Change Acquisition (the "Optum Antitrust Fact Sheet").  The Optum Antitrust Fact Sheet addressed the DOJ Antitrust Suit, which sought to block the Change Acquisition; in pertinent part, the Optum Antitrust Fact Sheet asserted that the "***theories at the core of the [DOJ's] case are completely without merit***" and touted Optum's purported best-in-class firewalls:

> Our track record of safeguarding our customers' proprietary information speaks for itself. ***We have best-in-class firewalls and compliance programs that maintain the integrity of our customers' data and information, and prevent unauthorized access and misuse.*** Combining with Change Healthcare alters none of these fundamentals."

147.   On March 11, 2022, UnitedHealth filed its Answer to the operative complaint in the DOJ Antitrust Suit, arguing that the Company has "agreed to make binding commitments to its customers and the Government" to "maintain its robust firewall processes—and extend them to Change's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes."  The Company further asserted in its Answer to the DOJ Antitrust Suit that "OptumInsight imposes strict limitations on the use or disclosure of external customer data . . . ."

148.   Six days later, on March 17, 2022, as part of its public relations efforts to prevail in the DOJ Antitrust Suit, UnitedHealth posted to its website a page and document entitled: "Benefits of Combination with Change Healthcare" (the "March 2022 Antitrust PR Push").  The March 2022 Antitrust PR Push stated, in pertinent part:

> Optum will maintain robust firewall processes and extend them to Change Healthcare's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes.
>
> * * *
>
> [Optum] invests extraordinary time, money, and resources into safeguarding [customer sensitive] information and keeping it walled off from UnitedHealthcare.
>
> * * *
>
> ***UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer [information]***.

149.   On April 22, 2022, the Company filed its 2022 Proxy Statement on Schedule 14A with the SEC (the "2022 Proxy") which solicited, *inter alia*, the re-election of certain Individual Defendants to the Board and advisory approval of executive compensation.  The 2022 Proxy stated, in pertinent part:

We believe health care data and related information should be used solely for the purposes of improving individual health, advancing health system performance and to aid in new health care discoveries. We operate in a sector where the use of health care information is highly regulated. Federal, state, and international laws and contractual commitments regulate our collection, use and disclosure of confidential information such as protected health information and personally identifiable information. Our success depends on maintaining a high level of trust among consumers, clients, providers, regulators and our associates. Protecting this information is critical and is reflected in our Code of Conduct, security standards, and privacy policies.

The Audit and Finance Committee has oversight of our cyber security program and receives regular updates from our Chief Information Security Officer. We devote significant resources to protecting and evolving the security of our computer systems, software, networks and other technology assets in response to a continually changing threat landscape. The operating maturity of our cyber security program is benchmarked against a continuously updated set of control requirements based upon the HITRUST framework and is subject to an annual external certification process by the HITRUST Alliance. An incidence response preparedness assessment was conducted in 2020 by a leading external cyber security company.

We provide annual security-awareness and privacy training to all of our employees, including part-time and temporary, and contractors, which covers timely and relevant topics, including social engineering, phishing, password protection, confidential data protection, asset use and mobile security. Our comprehensive privacy-incident response and prevention program educates associates on the importance of reporting all incidents immediately. Each incident is reviewed and action is taken to address issues identified, mitigate any potential impact and assess our obligations to notify consumers, clients, regulators, the media and others. Information regarding how we manage data privacy and cyber security is available at https://www.unitedhealthgroup.com/content/sustainability/en/responsible-business/data-privacy.html.

150.    In a section entitled "Responsible Business Practices," the 2022 Proxy stated,

in pertinent part:

- **Maintaining strong and effective corporate governance** to drive sustained shareholder value and respond to the interests of our shareholders.

- **Adhering to our values** through ethics and compliance that guide our behavior and help us remain a trusted partner.
- **Maintaining data privacy and cyber security**, recognizing our obligation to build and maintain the trust and confidence of our stakeholders and customers, ensuring we can protect the information for all those we serve.
- **Partnering with suppliers** to maximize value in our supply chain to ensure we buy the right goods and services, from the right suppliers, for the right price, in a timely manner.
- **Committing to supplier diversity** by developing a supplier base that reflects the communities and customers we are privileged to serve.

151. Then, in May 2022, the Company adopted a new firewall policy relating to the proposed Change acquisition (the "Change Firewall Policy"). The Change Firewall Policy addressed how customer CSI would be managed between Optum and UnitedHealthcare, stating in pertinent part:

> The disclosure of External Customer CSI to [UnitedHealth] business units that are competitors of such External Customers is strictly prohibited;

> The use of External Customer CSI to benefit [UnitedHealth] business units that are competitors of such External Customers is strictly prohibited;

> UnitedHealth employees "may not access External Customer CSI unless such access is necessary to perform their job responsibilities";

> External Customer CSI shall be logically separated from other [UnitedHealth] business unit data within Electronic Data Sites; and

> No employees of other [UnitedHealth] business units that are competitors of an External Customer shall have access to the location where External Customer CSI is stored within such Electronic Data Sites.

152. On June 14, 2022, UnitedHealth issued its 2021 Sustainability Report (the "2021 Sustainability Report") in which it stated that it was "***focused***" on "***maintaining data privacy and cybersecurity***," expressly recognizing its "***obligation***" to "***protect the information of all those we serve***." The Company also stated that it was "***required to***

*safeguard personal information reasonably and appropriately*" and that the "*[p]rimary tools used to fulfill those obligations are cybersecurity and data privacy programs*." Further, the Sustainability Report explained that UnitedHealth "*manages a robust Information Security Risk Management and Privacy Program that improves its ability to make risk-informed decisions by conducting systematic and structured reviews of information security risks*." These reviews are then "communicated to executive leadership and presented to the Audit and Finance Committee of the Board of Directors quarterly."

153.   The 2021 Sustainability Report also spoke to the Company's data protection policies and claimed that "*data protection policy applies to all lines of business and subsidiaries*" and that its "*Code of Conduct outlines our commitment to protecting the information entrusted to us. Supported by a comprehensive set of principles, our policies and programs describe* appropriate *uses of data and the safeguards that protect the confidentiality and integrity of our systems*." These policies include "[e]nterprise information security policies," "[p]rivacy and data protection policies," and "[a]n incident management program that encompasses cybersecurity, privacy and compliance obligations."

154.   On July 22, 2022, UnitedHealth filed its Amended Pretrial Brief in connection with the DOJ Antitrust Suit, within it stating, "*UHG has an 'advanced and sophisticated technology architecture and infrastructure' of internal firewalls that prevent the sharing of competitively sensitive information across business units*."

155.    On September 7, 2022, UnitedHealth filed its Post-Trial Brief in connection with the DOJ Antitrust Suit, which stated the Company had "***operationalized its firewall policy through 'robust' technological systems that prevent employees of one UHG business unit from accessing data housed within another UHG business unit***."

156.    On the same day, UnitedHealth filed its Proposed Findings of Fact in the DOJ Antitrust Suit, stating in pertinent part:

> ***For years, UHG has maintained robust firewall and data security policies specifically designed to make sure customers' potentially sensitive information is protected and not misused in any way. UHG commits to apply these same firewall and data security policies to customer data held by Change on behalf of Change's EDI customers, and to uphold all contractual rights of Change's customers to audit the protection and security of their data.***

157.    On November 29, 2022, UnitedHealth hosted its 2022 Investor Conference, materials for which were publicly released on November 28, 2022.  The 2022 Investor Conference materials, which the Company made publicly available to investors, touted the Company's "***long-established firewalls and strong legal, reputational, ethical and financial incentives to protect patient and customer information***."

158.    On April 21, 2023, the Company filed its 2023 Proxy Statement on Schedule 14A with the SEC (the "2023 Proxy") which solicited, *inter alia*, the re-election of certain Individual Defendants to the Board and advisory approval of executive compensation.  The 2023 Proxy stated, in pertinent part:

> The use of health care information is highly regulated. Federal, state, and international laws and contractual commitments regulate our collection, use and disclosure of confidential information such as protected health information and personally identifiable information. Our success depends on maintaining a high level of trust among consumers, clients, providers,

regulators and our associates. Protecting this information is critical and is reflected in our Code of Conduct, security standards, and privacy policies.

The Audit and Finance Committee has oversight of our cybersecurity program and receives regular updates from our Chief Information Security Officer. We devote significant resources to protecting and evolving the security of our computer systems, software, networks and other technology assets in response to a continually changing threat landscape. The operating maturity of our cybersecurity program is benchmarked against a continuously updated set of control requirements based upon the HITRUST framework and is subject to an annual external certification process by the HITRUST Alliance. An incidence response preparedness assessment was conducted in 2020 by a leading external cyber security company.

We provide annual security-awareness and privacy training to all of our employees, including part-time and temporary, and contractors, which covers timely and relevant topics, including social engineering, phishing, password protection, confidential data protection, asset use and mobile security. Our comprehensive privacy-incident response and prevention program educates associates on the importance of reporting all incidents immediately. Each incident is reviewed and action is taken to address issues identified, mitigate any potential impact and assess our obligations to notify consumers, clients, regulators, the media and others. Information regarding how we manage data privacy and cyber security is available at https://www.unitedhealthgroup.com/content/sustainability/en/responsible-business/data-privacy.html.

159.    In a section entitled "Responsible Business Practices," the 2023 Proxy stated,

in pertinent part:

**Maintaining strong and effective corporate governance** to drive sustained shareholder value and respond to the interests of our shareholders.

**Adhering to our values** through compliance and ethics principles that guide our behavior and help us remain a trusted partner.

**Maintaining data privacy and cybersecurity**, recognizing our obligation to build and maintain the trust and confidence of our stakeholders and customers and ensuring we can protect the information of all those we serve.

**Partnering with suppliers** to maximize value in our supply chain to ensure we buy the right goods and services from the right suppliers for the right price, in a timely manner.

**Committing to supplier diversity** by developing a supplier base that reflects the communities and customers we are privileged to serve.

**Utilizing machine learning and artificial intelligence** to ensure technology is developed, deployed and monitored ethically and responsibly and is aligned with our mission.

160.    On June 1, 2023, Defendant Witty gave remarks on behalf of the Company during an investor conference call hosted by Sanford C. Bernstein (the "Bernstein Call"). During the Bernstein Call, Defendant Witty shared that the Company was strategically focused on "***exploiting the core synergy between Optum and UnitedHealth as much as we possibly can appropriately, of course, given the firewall requirements [that] are needed here***," while at the same time assuring the public that the Company maintained appropriate firewalls to keep the data in its respective business units siloed so as to prevent internal abuse of access between UnitedHealth's subsidiaries.  Defendant Witty stated, in pertinent part:

> Three things we've been focused on over the last two years to really improve our performance: making sure that we're exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements that are needed there . . . .

161.    The above statements were materially false and misleading when made.  The Individual Defendants, in their roles as directors and officers of the Company, would have been in a position to know that: (i) United Health and Optum lacked both role-based security systems and technical firewalls; (ii) numerous UnitedHealth and Optum business applications lacked sufficient role-based security protocols to prevent users from one

UnitedHealth or Optum business from accessing data from another UnitedHealth or Optum business; and (iii) UnitedHealth and Optum lacked adequate governance frameworks to enforce data segregation.

### F. The Truth Emerges as Defendants Continue to Make Misrepresentations

#### i. The Change Data Breach

162.    UnitedHealth's wrongdoing began to publicly emerge on February 22, 2024, when the Company disclosed in a filing with the SEC that Change Healthcare, the Company's newly acquired subsidiary, suffered a data-breach by a nation-state-associated cyber security threat actor; worldwide news coverage immediately followed.[17]

163.    Then, just four days later, on February 26, 2024, *The Examiner News* published an opinion article, titled, "Justice Department Probing UnitedHealth/Optum Over Antitrust Concerns; Local Layoffs Enacted, More Forecast," (the "February 2024 Examiner News Article") revealing that on October 10, 2023, UnitedHealth had received notice from the DOJ that it had launched a "non-public antitrust investigation into the [C]ompany" (the "October 2023 DOJ Investigation"). The following day, on February 27, 2024, *The Wall Street Journal* published an article titled, "U.S. Opens UnitedHealth

---

[17] *See e.g.*, Raphael Satter, Sriparna Roy, Rishabh Jaiswal & Tom Hals, *Change Healthcare Network Hit by Cybersecurity Attack*, Reuters (Feb. 22, 2024), https://www.reuters.com/business/healthcare-pharmaceuticals/change-healthcare-network-hit-by-cybersecurity-attack-2024-02-22; Jordan Robertson, John Tozzi, & Sana Pashankar, *UnitedHealth Cites 'Nation-State' in Hack Disrupting Medical Data Exchange Network*, Bloomberg News (Feb. 22, 2024), https://www.bloomberg.com/news/articles/2024-02-22/unitedhealth-cyberattack-disrupts-medical-data-exchange-network.

Antitrust Probe" (the "February 2024 WSJ Article"), incorporating by reference the February 2024 Examiner News Article and thereby revealing to a substantially larger readership audience that the DOJ was investigating UnitedHealth, *inter alia*, for whether the Company's "ownership of healthcare providers could present challenges to health insurers that are rivals to UnitedHealthcare," and for "Medicare billing issues, including the [C]ompany's practices around documenting patients' illnesses."[18]

164.   On the news of the Change Data Breach and of the newly revealed October 2023 DOJ Investigation, UnitedHealth's stock price fell from $526.24 on February 22, 2024, to $472.60 on March 6, 2024, a drop of $53.64 or 10.19% in just two weeks.

### ii.  The CMS Fraud Scheme

165.   From March 2024 through September 2025, dozens of investigative reports about UnitedHealth's CMS Fraud Scheme and the Change Data Breach have been published by *The Examiner News*, *The Wall Street Journal*, *STAT News*, and in many other news outlets.[19]   Despite the steady barrage of news coverage, with each week since March

---

[18] The February 2024 WSJ Article was first published online on WSJ.com, the same article then appeared in February 28, 2024 printed edition of *The Wall Street Journal* as "UnitedHealth Faces New Probe by DOJ Over Antritrust Issues."

[19] *See e.g.*, Adam Stone, *Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum,* The Examiner News (Mar. 18, 2024); Christopher Weaver & Tom McGinty, *How the Journal Analyzed Medicare Advantage Data,* Wall St. J. (July 7, 2024); Christopher Weaver et al., *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated,* Wall St. J. (July 8, 2024); Bob Herman et al., *How UnitedHealth harnesses its physician empire to squeeze profits out of patients,* STAT News (July 25, 2024); Anna Wilde Mathews et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare,* Wall St. J. (Aug. 4, 2024); Casey Ross et al., *How UnitedHealth turned a questionable artery-screening program into a gold mine,* STAT News (Aug. 7, 2024); Tara

2024 yielding new information about the CMS Fraud Scheme and the Change Data Breach, the Individual Defendants made conscious and continual efforts to conceal and deny the full extent of the Company's CMS Fraud Scheme and Change Data Breach.

166.    For example, during the Q1 2024 Earnings Call on April 16, 2024, Defendant Witty claimed that Medicare Advantage "drives better health outcomes; provides a higher value, significantly more comprehensive benefit for people, all at a lower cost to beneficiaries and taxpayers; and is more popular with and valuable to seniors than traditional Medicare" and then, on the Q2 2024 Earnings Call, Witty reiterated that, "[the Company's] home visit programs help patients live healthier lives and save taxpayers' money."

167.    The July 8 WSJ Article also revealed that UnitedHealth used the HouseCalls program to inflate Member diagnoses, thereby increasing the payments the Company received from CMS.  But, during the Q2 2024 Earnings Call on July 16, 2024, Defendant Witty reiterated, *inter alia*, that "[UnitedHealth's] [HouseCalls] programs help patients live

---

Bannow et al., *Inside UnitedHealth's strategy to pressure physicians: $10,000 bonuses and a doctor leaderboard,* STAT News (Oct. 16, 2024); Christopher Weaver & Anna Wilde Mathews, *Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds,* Wall St. J. (Oct. 24, 2024); Bob Herman et al., *UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits,* STAT News (Nov. 25, 2024); Casey Ross et al., *Lawmakers call for curbs on UnitedHealth's growing empire,* STAT News (Dec. 23, 2024); Christopher Weaver et al., *UnitedHealth's Army of Doctors Helped it Collect Billions More From Medicare,* Wall St. J. (Dec. 29, 2024); Tara Bannow, *DOJ seeks interviews with former UnitedHealth Group doctors,* STAT News (Jan. 12, 2025).

healthier lives and save taxpayers' money," casually denying the truth that had emerged through the July 8 WSJ Article.

168.    Less than two weeks after the Q2 2024 Earnings Call, on July 25, 2024, *STAT News* published an investigative article titled "How UnitedHealth harnesses its physician empire to squeeze profits out of patients" (the "July 25 STAT News Article").  The July 25 STAT News Article detailed how UnitedHealth gets bigger payments from CMS by inflating Member risk scores, making them appear sicker than they really are, which was achieved in part by using coercive pressure tactics and financial incentives with the Company's employees.  A UnitedHealth spokesperson is quoted in the July 25 STAT News Article, who, on behalf of the Company, denied any wrongdoing, stating in pertinent part:

> [T]he company's "providers and partners make independent clinical decisions, and we expect them to diagnose and document patient information completely and accurately in compliance with [federal] guidelines. We provide training and other practice support to providers because it leads to better care management, coordination, and patient follow-up. Regulators routinely audit this documentation."

169.    The July 8 WSJ Article and the August 4 WSJ Article (collectively, the "2024 WSJ Investigative Reports") concluded, based on its review of Medicare Advantage data, that UnitedHealth used upcoding to boost their Medicare Advantage profits.  In response to the 2024 WSJ Investigative Reports, UnitedHealth issued a press release titled "UnitedHealth Group's Response to the Wall Street Journal" (the "UnitedHealth WSJ Response").  The UnitedHealth WSJ Response denied the *WSJ's* findings described in the 2024 WSJ Investigative Reports, more specifically, the UnitedHealth WSJ Response stated that "*[t]he WSJ's core thesis, methodology and conclusions are flawed*" and its assertions

are *"*unsubstantiated, and the WSJ presented no credible evidence to support this claim." The UnitedHealth WSJ Response doubled down on the Company's position, stating that HouseCalls, "provides in-home clinical assessments at no cost to millions of seniors each year" and further claiming that it is "to better understand their current health status, identify conditions, and connect patients to necessary specialists and high-quality medical care. It's a critical touchpoint in the care continuum, supplementing annual physician visits – not replacing them – and ensuring people have access to needed services, including housing, food and social support."

170.    The August 4 WSJ Article detailed how, *inter alia*, UnitedHealth relied on a single HouseCalls visit and the flawed QuantaFlo diagnostic device to add additional, often un-medically-supported, diagnosis codes for Members.  Four days later, on August 8, 2024, UnitedHealth responded to the August 4 WSJ by issuing a press release titled "UnitedHealth Group's Response to the Wall Street Journal."  In the release, the Company claimed to "[s]et[] the record straight on HouseCalls, Medicare Advantage and the demonstrably superior health outcomes and cost savings to more than 33 million American seniors each year."

171.    On October 21, 2024, the OIG issued a report titled "Medicare Advantage Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions" (the "2024 OIG Report").  The 2024 OIG Report found that in 2023, MA Plans received $4.8 billion in risk-adjusted payments that were based solely on diagnoses from in-home HRAs and HRA-linked chart reviews and, of that, UnitedHealth received $3.2 billion—about two-thirds of the total payments—despite enrolling only 28% of MA

members.   The 2024 OIG Report also found that UnitedHealth was responsible for generating more than half of the MA Plans payments that were tied solely to a single in-home HRA and no other service or treatment record.

172.   The 2024 OIG Report concluded that "either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews."  The OIG also expressed concern about UnitedHealth's practice of using their own medical professionals to conduct in-home HRA's, as opposed to the Members' primary care provider in a clinical setting.  As a result of its findings, OIG recommended that CMS restrict or even prohibit payments to MA Plans for diagnoses from in-home visits and linked chart reviews.

173.   Thus, UnitedHealth, via its Optum subsidiary, purposefully and systematically inflated its MA Members' risk scores so that UnitedHealth would receive higher CMS payments.

174.   The 2024 OIG Report singled out UnitedHealth as a pervasive abuser of using its HouseCalls program to generate over $3.7 billion in Medicare Advantage payments from CMS in 2023, representing more than half of all payments for the entire Medicare Advantage program, nationwide.  The 2024 OIG Report raised grave concerns about UnitedHealth's questionable use of the HouseCalls program and its role in driving up CMS payments by billions.

175.   Then, on October 24, 2024, three days after the 2024 OIG Report became public, *The Wall Street Journal* published yet another investigative report, titled, "Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds" ("October

2024 WSJ Article").  The October 2024 WSJ Article referenced the 2024 OIG Report, describing how UnitedHealth manipulates the MA system by utilizing in-home HRAs and chart reviews at the expense of vulnerable seniors and taxpayers.  A UnitedHealth spokesman, speaking on behalf of the Company, was quoted in the October 2024 WSJ Article, denying the 2024 OIG Report findings and stating that the findings were, "[a] misleading, narrow, and incomplete view of risk adjustment data is being used to draw inaccurate conclusions about the value of in-home care for America's most vulnerable seniors in Medicare Advantage."  The October 2024 WSJ Article report further quoted the UnitedHealth spokesman as saying that "[the in-home visits] are comprehensive assessments by highly trained clinicians that take 45 to 60 minutes and help 'identify and drive needed follow-on care for the vast majority of the patients with whom we engage."

176.   UnitedHealth issued a press release on December 3, 2024, with financial guidance for 2025 (the "December 2024 Press Release").  The December 2024 Press Release stated in pertinent part, "UnitedHealth Group will introduce its 2025 outlook which includes revenues of $450 billion to $455 billion, net earnings of $28.15 per share to $28.65 per share and adjusted net earnings of $29.50 per share to $30.00 per share."

177.   Then, on December 29, 2024, *The Wall Street Journal* published another article investigating UnitedHealth's fraudulent business practices related to its MA programs, titled, "UnitedHealth's Army of Doctors Helped it Collect Billions More From Medicare" (the "December 2024 WSJ Article").  The December 2024 WSJ Article included interviews with former UnitedHealth providers, reporting how the Company carefully implemented business processes that led to billions of dollars of overpayments from CMS

to UnitedHealth for its MA plans.  The interviewees referenced in the December 2024 WSJ Article described how UnitedHealth forced its providers to use pre-filled checklists and software that was designed to increase the sickness scores of MA Members with questionable diagnoses and promised financial incentives to providers for documenting lucrative diagnoses.

178.   The December 2024 WSJ Article included a written statement provided by a UnitedHealth spokesperson, stating in pertinent part, that the Company's MA practices lead to "more accurate diagnoses, greater availability of care and better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management," and help "to avert more serious health problems later, and to achieve Medicare Advantage's goals of improving quality and reducing costs."

179.   On January 16, 2025, UnitedHealth issued a press release announcing its Q4 2024 and FY 2024 financial results (the "FY 2024 Release").  The FY 2024 Release reaffirmed the financial guidance provided in the December 2024 Press Release and made specific reference to certain "portfolio refinement" transactions:

> The full year 2024 operating cost ratio of 13.2% compared to 14.7% in 2023, reflecting gains from business portfolio refinement and strong improvement in operating efficiencies and consumer experiences. The business portfolio refinement, including strategic transactions, will enhance growth opportunities and contributed about 80 basis points, nearly half at Optum Health with the remainder split between UnitedHealthcare and Optum Insight.

180.   On the same day as the FY 2024 Release, UnitedHealth hosted its earnings call with investors to discuss the Company's financial performance for Q4 2024 and FY

2024 (the "FY 2024 Earnings Call").   UnitedHealth was represented on the FY 2024

Earnings Call by Defendants Witty, Rex, and Noel.

181.   During the FY 2024 Earnings Call, in his prepared remarks, Defendant Witty

stated, in pertinent part:

> *[The Company is] continuing to invest in programs like Medicare Advantage, which, by providing coordinated care to seniors, is proven to deliver better health outcomes at lower cost to consumers and taxpayers compared to fee-for-service Medicare.*

182.   Defendant Rex provided investors with the underlying basis for the

Company's 2025 guidance, stating in pertinent part:

> *To start for '25, the outlook we shared in December incorporates a view of care activity commensurate with what we saw in '24, even the care activity we experienced as we exited the year.*
>
> *   *   *
>
> *With strong retention and the many returning consumers, we start the year with highly informed insights into the care needs of the people we will be serving.*

183.   Defendant Rex also addressed the Company's in-home patient visit program,

stating in pertinent part:

> As we move into '25, we will continue to enhance access and care integration through the home, a much-needed area to help people with their health. More than three-quarters of our in-home patient visits result in a primary care visit within 90 days. *Medicare Advantage patients with chronic conditions who receive a home care visit have a lower rate of ER visits, fewer inpatient stays, stronger health outcomes, and a better experience, all while saving the health system billions.*

184.   On February 21, 2025, *The Wall Street Journal* published an article titled,

"DOJ Investigates Medicare Billing Practices at UnitedHealth" (the "February 2025 WSJ

Article"), an exclusive story reporting that DOJ had initiated a new civil fraud investigation "examining [UnitedHealth's] practices for recording diagnoses that trigger extra payments to its Medicare Advantage plans." The February 2025 WSJ Article provided a detailed account of new DOJ investigation against UnitedHealth, including naming one of its sources, Valerie O'Meara, a nurse practitioner who worked for UnitedHealth in Washington State.

185. The February 2025 WSJ Article provided details of the civil fraud investigation, stating in pertinent part:

> Last month, Justice Department lawyers from the offices of the U.S. Attorney for Minnesota and the Washington, D.C.-based Civil Division contacted at least three doctors and a nurse practitioner who were named in the Journal's story on UnitedHealth-owned clinics. One of the people was told the health department's Office of Inspector General was involved as well.

> [Doctors and nurse practioners] said they were questioned about specific diagnoses UnitedHealth promoted for employees to use with patients, incentive arrangements and pressure to add the diagnoses. At least two provided documents, including a contract with a UnitedHealth unit, to the Justice Department.

> Valerie O'Meara, a nurse practitioner who worked for UnitedHealth in Washington state, said she was interviewed on Jan. 31 by Justice Department attorneys who were interested in the company software that suggested diagnoses and the role of a UnitedHealth manager who she said urged her to make new diagnoses beyond what doctors had treated.

> The attorneys zeroed in on certain diagnoses the company often suggested, such as an obscure hormonal condition called secondary hyperaldosteronism, she said. The Journal's analysis found the conditions was rarely diagnosed by Medicare doctors not working for UnitedHealth.

> O'Meara said the attorneys focused on her account of how she was told she could add the hyperaldosteronism diagnosis to patients' records without a lab test.

> More broadly, she said, "they were looking at, 'Is this abuse?'"

186.    On the same day, UnitedHealth publicly responded to the February 2025 WSJ Article shortly after it was published, vehemently denying *The Wall Street Journal's* reporting and stating in full:

> The Wall Street Journal continues to report misinformation on the Medicare Advantage (MA) program. The government regularly reviews all MA plans to ensure compliance and we consistently perform at the industry's highest levels on those reviews. We are not aware of the "launch" of any "new" activity as reported by the Journal. We are aware, however, that the Journal has engaged in a year-long campaign to defend a legacy system that rewards volume over keeping patients healthy and addressing their underlying conditions. Any suggestion that our practices are fraudulent is outrageous and false.

187.    On this news, UnitedHealth's stock price fell $36 per share, from $502 per share on February 20, 2025 to just over $466 per share on February 21, 2025.

188.    The Company filed its SEC Form 10-K for the fiscal year ended December 31, 2024, on February 27, 2025 (the "2024 10-K").  The 2024 10-K, which was signed by Defendants Witty, Rex, Hemsley, Baker, Flynn, Garcia, Gil, Hooper, McNabb, Rice, and Noseworthy, reported on HouseCalls, stating in pertinent part:

> As a result of continued portfolio refinement, the Company sold other businesses and assets and entered into strategic transactions. These transactions resulted in total consideration received of $3.0 billion and an additional $1.9 billion of equity method investments related to the valuation of our retained interests in certain transactions. The carrying value for these transactions was $1.0 billion, primarily related to goodwill. The gains from business portfolio refinement, including strategic transactions, were recorded within operating costs in the Consolidated Statement of Operations and contributed about 80 basis points ($3.3 billion) to the operating cost ratio, nearly half ($1.4 billion) related to Optum Health with the remainder split between UnitedHealthcare ($1.1 billion) and Optum Insight ($800 million). Certain transactions also included various put and call options, which were valued at $630 million and included in other liabilities on the Consolidated Balance Sheet. As of December 31, 2024 the total estimated future obligation

under these arrangements if the Company decided or was required to repurchase these interests was up to $3.4 billion.

189.   Then the April 2025 STAT News Article, published on April 16, 2025, revealed that Semler, the manufacturer of the QuantaFlo diagnostic tool used by HouseCalls nurses to create bogus diagnoses, had agreed to settle fraud claims with the DOJ.

190.   UnitedHealth reported its Q1 2025 results and revised its FY 2025 guidance on April 17, 2025 (the "Q1 2025 Earnings Release"); the Company significantly decreased its forecasted 2025 net earnings and adjusted earnings.  More specifically, as recently as January 16, 2025, the Company had forecasted 2025 net earnings at a range of $28.15 - $28.65 per share and 2025 adjusted net earnings at a range of $29.50 - $30.00 per share; the Q1 2025 Earnings Release revised down 2025 forecasted net earnings down to a range of $24.65 - $25.15 per share and 2025 forecasted adjusted net earnings down to range of $26.00 - $26.50 per share.  The Q1 2025 Earnings Release attributed the revisions to headwinds relating to Medicare Advantage.

191.   On the same day, on April 17, 2025, the Company held its Q1 2025 Earnings Call ("Q1 2025 Earnings Call") with investors to discuss the Company's financial performance for Q1 2025.  UnitedHealth was represented on the Q1 2025 Earnings Call by Defendants Witty, Rex, Noel, and Cianfrocco,

192.   During the Q1 2025 Earnings Call, Defendant Witty stated, in pertinent part:

Medicare Advantage also costs taxpayers less and delivers more to seniors than fee for service Medicare, especially in value based care arrangements. An essential approach in in in achieving both health outcomes and lowered costs is ensuring people get the care they need when and where they need it.

And a good place to understand those needs better is in a senior's home. Our HouseCalls program does just that.

HouseCalls, which is only available in Medicare Advantage, provides a thorough in home clinical visit at no cost to seniors. Following CMS' best practices for such care, our clinicians review a patient's medical history and current medications, conduct comprehensive physical exams, provide lab tests and screenings, and coordinate necessary follow on care. HouseCall's clinicians closed millions of care gaps last year, helping people stay out of the hospital and the emergency department and referring those in need to appropriate social services to help them live healthier at home. This is Medicare Advantage innovation and value in action, helping drive proactive, preventive engagement with the health system rather than more expensive reactive acute care. These benefits and innovations and their value to seniors and taxpayers were put at unnecessary risk by funding cuts in recent years to the Medicare Advantage program.

193.   During the question and answer portion of the Q1 2025 Earnings Call, in response to a question about the company's path to a long term growth rate from Lisa Gill, Managing Director at JP Morgan, Defendant Witty replied that, "[] an awful lot of the issue that we're seeing early in '25, we can fix in '25 and help us deliver stronger performance for '26, and we expect that to then be a kind of ramp into reacquiring our target growth rate momentum that we aspire to as an organization."

194.   On this news, over the course of two days, UnitedHealth's stock dropped 27.3%, or $159.71 per share, falling from $585.04 on April 16, 2025, to $425.33 per share on April 21, 2025, erasing over $144.8 billion in market capitalization.

195.   On May 13, 2025, UnitedHealth issued a press release announcing the departure of Defendant Witty as the Company's CEO and the suspension of the Company's 2025 financial forecast (the "May 2025 Press Release").  According to the May 2025 Press Release:

UnitedHealth Group today announced the appointment of Stephen J. Hemsley as its chief executive officer, effective immediately, following Andrew Witty's decision to step down as CEO for personal reasons. Hemsley, who served as company CEO from 2006-2017, will remain chairman of the company's Board of Directors and Witty will serve as a senior advisor to Hemsley.

\*       \*       \*

Additionally, the company suspended its 2025 outlook as care activity continued to accelerate while also broadening to more types of benefit offerings than seen in the first quarter, and the medical costs of many Medicare Advantage beneficiaries new to UnitedHealthcare remained higher than expected.

196. During an emergency conference call held with investors on the same day, Defendant Rex confirmed that increased utilization costs within the Company's Medicare Advantage business were continuing to adversely impact its financial performance.

197. On this news, UnitedHealth's stock dropped $67.37 per share, or 17.38%, from $378.75 on May 12, 2025 to $311.38 on May 13, 2025, erasing over $61.1 billion in market capitalization.

198. On May 14, 2025, *The Wall Street Journal* published an article titled, "UnitedHealth Group is Under Criminal Investigation for Possible Medicare Fraud," (the "May 2025 WSJ Article") reporting that in addition to existing civil investigations, UnitedHealth was now under criminal investigation by the DOJ for possible criminal Medicare fraud related to the Company's Medicare Advantage business" (the "May 2025 DOJ Criminal Investigation"). The May 2025 WSJ Article reported, in pertinent part:

The Justice Department is investigating UnitedHealth Group for possible criminal Medicare fraud, people familiar with the matter said.

The healthcare-fraud unit of the Justice Department's criminal division is overseeing the investigation, the people said, and it has been an active probe since at least last summer.

While the exact nature of the potential criminal allegations against UnitedHealth is unclear, the people said the federal investigation is focusing on the company's Medicare Advantage business practices.

199.    The May 2025 WSJ Article incorporated an official statement from UnitedHealth, whereby the Company categorically denied any knowledge of being criminally investigated by the DOJ.

200.    On this news, UnitedHealth's stock dropped another 11%, or $33.76 per share on May 15, 2025, erasing another $30.6 billion in market capitalization.  In a little over a month, UnitedHealth's stock price had fallen by 53.1%. or $310.69 per share, erasing over $281.8 billion in market capitalization.

201.    Then, one week later, on May 21, 2025, HSBC reduced its guidance for UnitedHealth and slashed its price target for the Company by approximately 45%, reducing it from $490 per share to $270.  HSBC took this action due to the "[l]eadership change, pulled 2025 guidance, [and] alleged Medicare fraud [that has] resulted in market cap halving since [the] Q1 result" was released on April 17, 2025.

202.    On the same day, *The Guardian* published a bombshell investigative report titled, "Revealed: UnitedHealth secretly paid nursing homes to reduce hospital transfers" (the "May 2025 Guardian Article"), revealing that UnitedHealth's CMS Fraud Scheme involved paying nursing homes substantial bonuses to manipulate hospital costs by reducing hospital transfers for residents covered by UnitedHealth's Medicare Advantage plans.  According to the May 2025 Guardian Article, which was based on thousands of

confidential records and interviews with over twenty current and former employees, UnitedHealth had secretly paid nursing homes hundreds of thousands of dollars each year to disincentivize sending residents to the hospital, and thereby decreasing the "admits per thousand" (APK) rate—a key metric measuring how often residents are sent to hospitals.

203.    UnitedHealth responded to the May 2025 Guardian Article by publishing an official statement to its website, categorically denying the May 2025 Guardian Article investigative report allegations.

204.    Also on May 21, 2025, CMS announced that it was implementing an aggressive strategy to enhance and accelerate Medicare Advantage audits, revealing that the Medicare Payment Advisory Commission estimates that Medicare Advantage plans may overbill the government by as much as $43 billion per year.

205.    On May 22, 2025, Morningstar published an analyst report titled, "UnitedHealth: Cutting Fair Value Estimate as Medicare Advantage and Other Practices Questioned," reporting that "[UnitedHealth] [a]s the largest Medicare Advantage insurer [and one] that may have been more aggressive than peers in risk assessments, UnitedHealth could be subject to a big clawback of overpayments and lower margins in that business [] [and] could result in a $20 billion outflow at UnitedHealth."

206.    On this news, UnitedHealth's stock dropped $24.91, or 7.8%, from $321.58 on May 20, 2025 to $296.67 on May 22, 2025.

207.    On July 9, 2025, *The Wall Street Journal* published an article, titled "Prosecutors Question Doctors About UnitedHealth's Medicare Billing Practices" (the "July 9 2025 WSJ Article"), reporting, in pertinent part, that the DOJ was proceeding with

its investigations into UnitedHealth's Medicare Advantage plans and that former UnitedHealth employees disclosed to *The Wall Street Journal* that they had recently been questioned by prosecutors.

208.    On the same day, UnitedHealth published to its website, "Response to July 9 Wall Street Journal Article," stating, in pertinent part, that the "[July 9 2025 WSJ Article] represents a continuation of [*The Wall Street Journal*'s] sustained campaign against Medicare Advantage, relying on incomplete data, a predetermined narrative and a flawed understanding of how the Medicare Advantage program works."  The Response to the July 9 Wall Street Journal Article further stated:

> Independent CMS audits confirm we are among the most accurate in the industry in our coding practices, demonstrating our commitment to integrity and compliance. Additionally, after more than a decade of a similar Department of Justice challenge to our Medicare Advantage business, the Special Master concluded there was no evidence to support the claims that we were overpaid or engaged in any wrongdoing.

> We take seriously our role in protecting the integrity of the Medicare Advantage program. We have long advocated for audits across all Medicare Advantage plans each year to give all stakeholders confidence in plan reimbursements and to dispel false narratives about overpayments. We maintain robust procedures and employ certified clinical professionals to ensure our programs meet the highest standards. Recently, we announced that we will deploy a regular, independent third-party coding oversight and audit process to supplement our existing quality assurance program—so all stakeholders can have the same confidence in our performance and compliance that we do.

> Ultimately, we remain focused on what matters most: delivering better outcomes, more benefits, and lower costs for the people we serve.

209.    Two weeks later, on July 24, 2025, the Company published to its website an official statement titled, "UnitedHealth Group responds to Department of Justice

investigation" (the "July 24 UnitedHealth DOJ Admission Statement") confirming what *The Wall Street Journal* and other media outlets had been reporting since at least the beginning of 2025: the DOJ was actively conducting both civil and criminal investigations into UnitedHealth's Medicare Advantage billing practices.  The July 2025 UnitedHealth DOJ Admission Statement stated, in pertinent part: "The Company has now begun complying with formal criminal and civil requests from the [DOJ]."

210.  Financial analysts and the media noted that the Company's disclosure in the July 24 UnitedHealth DOJ Admission Statement came just two months after the Company criticized reports of a DOJ criminal probe into the Company as "deeply irresponsible."

211.  UnitedHealth reported its Q2 2025 results on July 29, 2025 (the "Q2 2025 Earnings Release"); the Company again significantly decreased its forecasted 2025 net earnings and adjusted earnings, lowering the forecast even below Wall Street's expectations.  More specifically, the Q2 2025 Earnings Release revised 2025 net earnings down to $14.65 per share and 2025 adjusted earnings down to $16.00 per share, marking a significant departure from the Company's original forecast made in January 2025 for 2025 net earnings at a range of $28.15 - $28.65 per share and 2025 adjusted net earnings at a range of $29.50 - $30.00 per share.

212.  As a result of the July 24, 2025 disclosure and revised guidance in the Q2 2025 Earnings Release and Q2 2025 Earnings Call, UnitedHealth's stock price sharply declined from $292.51 on July 23, 2025, to $237.77 on August 1, 2025, a drop of $54.74 per share, or 18.7%, in just nine (9) days, and total $387.48 decline, or 62%, from the Company's peak price of $625.25 on November 11, 2024.

213.    As the truth was revealed piecemeal, the Company continued to make the above statements, which were materially false and misleading when made. The Individual Defendants, in their roles as directors and high-level officers of the Company, would have been in a position to know that rather than helping patients, UnitedHealth was using in-home health risk assessments conducted by HouseCalls nurses, retroactive chart reviews, and provider pressure tactics, to generate diagnosis codes for conditions that were not based on medical necessity or that no doctor ever treated to increase Medicare Advantage payments. As a result, UnitedHealth had the highest average payments among Medicare Advantage insurers for in-home diagnosis per visit from 2019 to 2021. In fact, in 2021 alone, UnitedHealth brought in *$8.7 billion* in payments from CMS for diagnoses that no doctor ultimately treated, which represented over 50% of the Company's net income. And in 2023, the Company brought in $3.2 billion in Medicare Advantage payments from diagnoses reported only on in-home health risk assessments and health risk assessment-linked chart reviews—totaling two-thirds of the total risk adjusted payments CMS made to insurers in 2023 based on these same diagnostic methods.

### G. The Individual Defendants Were or Should Have Been Aware of the CMS Fraud Scheme and UnitedHealth's Misrepresentations

#### i. The CMS Fraud Scheme was Overseen by the Company's Directors and Officers

214.    UnitedHealth's upcoding practices were a core element of its business and generated a significant portion of its revenue. In 2021 alone, the Company secured an additional $8.7 billion from diagnoses that were never treated. The CMS Fraud Scheme

came down from leadership and depended on coordinated strategies and policies across business units throughout the Company.

215.    The Individual Defendants presided over a years-long pattern of systematic noncompliance with federal healthcare laws, regulatory mandates, and internal risk controls across the Company's Medicare Advantage and Optum business units.  Central to the Individual Defendants' failure was their sustained inaction despite clear and repeated red flags regarding fraudulent upcoding practices within the HouseCalls program.  From as early as 2016, internal audits, whistleblower complaints, and CMS feedback highlighted improper chart reviews, unsupported diagnoses, and the misuse of tools such as QuantaFlo to artificially inflate patient risk scores.  Despite these warnings, the Individual Defendants took no meaningful steps to investigate or correct the improper conduct.  Instead, the Board allowed senior executives to continue touting the HouseCalls program's clinical value while extracting billions of dollars in artificially inflated Medicare reimbursements.

216.    The Individual Defendants consciously ignored the risks of the Company's coding practices.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[20]  *See*  UHG_FISTEL220_00004044  (████████████████████████████
████████████████████████████████).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

217. For example, UnitedHealth trained its providers to add medically dubious diagnosis codes to patient charts during HouseCalls visits as a matter of Company policy. According to leaked audiotapes published by the media, UnitedHealth executives held meetings with nurses and administrators, instructing them on how to use "buddy codes" to insert unnecessary diagnoses for patients with related conditions.

218. UnitedHealth also placed systematic pressure on HouseCalls providers to maximize the number of diagnoses. Typically, nurse practitioners conducting these visits completed questionnaires about patient health, and they were encouraged by UnitedHealth to add diagnoses based on responses. A "quality assurance" team later reviewed the questionnaires to ensure all possible high-value diagnosis codes were included. If any codes were missing, reviewers pushed the providers to add them.

219. Additionally, HouseCalls providers were given laptops by UnitedHealth which were preloaded with software tailored to increase the number of recorded diagnoses.

---

[21] *See* UHG_FISTEL220_00004045 (████████████████████████████████████
████████████████████████████████████████).

[22] ███████

The software analyzed patients' medications and responses, suggested potential diagnoses, and organized them into a "diagnosis cart" for providers to quickly approve.

220.    UnitedHealth also supplied its healthcare providers with equipment designed specifically to generate unwarranted diagnoses, such as QuantaFlo, thereby driving revenue without regard for patients' actual medical needs.  UnitedHealth purchased and mandated the use of the QuantaFlo device, which was marketed as a tool to measure blood circulation but was notoriously unreliable and prone to false positives.  The QuantaFlo device was used to diagnose peripheral artery disease, a rare but financially lucrative condition.  UnitedHealth required providers to rely exclusively on this device for such diagnoses and designed a compensation structure that offered lucrative bonuses to healthcare providers who used QuantaFlo and similar devices regularly.  Between 2019 and 2021, UnitedHealth recorded 568,000 diagnoses of peripheral artery disease through in-home visits, producing $1.4 billion in payments to the Company.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

222.    In addition, the Company employed a team of risk-adjustment coders in India.  These coders were trained to identify the most profitable diagnosis codes and to

---

23 *See* UHG_FISTEL220_00006997 (████████████████████████████████████████
██████████████████████████████████).

coach providers on how to add them.   UnitedHealth even assessed these coders' job performance based on the extent of upcoding they accomplished.



224.    UnitedHealth also adopted a growth strategy that focused on acquiring new provider groups that could facilitate its CMS Fraud Scheme.   Beginning in 2010, the Company aggressively acquired hospitals, medical offices, and clinics until it controlled about 10% of all physicians in the United States. ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[24] *See* UHG_FISTEL220_00006328 (███████████████████████████).
[25] *See* UHG_FISTEL_00002996 (████████████████████████████████████████████████████████).



███████████████████████████████████████████████

████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

229.    In summary, the CMS Fraud Scheme was not a one-off scheme created by a few bad actors within the Company, but a complex enterprise level scheme orchestrated by the Individual Defendants specifically for the purpose of illegitimately generating billions of dollars of Medicare Advantage payments from CMS.

### ii. The Company's True Purpose of the Change Acquisition was to Provide UnitedHealth with an Unfair Competitive Advantage

230.    In preparation for the Change Acquisition, UnitedHealth and Optum engaged consulting firm McKinsey & Company ("McKinsey") to evaluate the value of Change. According to testimony from Optum executives Robert Musslewhite and Chris Hasslinger, McKinsey was tasked with assessing the value of Change's data assets.

231.    In January 2020, McKinsey delivered a presentation to UnitedHealth outlining the benefits to UnitedHealth of obtaining Change's data (the "McKinsey Change Data Presentation").  The McKinsey Change Data Presentation emphasized that Change had some of the most extensive and detailed datasets in multiple categories, with unrestricted HIPAA-compliant access, stating in pertinent part that Change:

- "enjoys [the] broadest and deepest datasets in several categories," with "unrestricted access under HIPAA guidelines";

- possesses a high depth and breadth of data assets for commercial claims;

- "manages the highest volume of claims compared to any other EDI competitor as well as a large percentage of longitudinal data sets that are more valued"; and

- "connects to >70% of all payers, providers, pharmacy and physician orgs."

232.    The McKinsey Change Data Presentation concluded that UnitedHealth could use Change's claims data as "transactions intelligence" to "optimize benefit design" for UnitedHealthcare.   By acquiring Change, UnitedHealth—the nation's largest health insurer—would gain a competitive edge by accessing vital information, including claims data from rival insurers.

233.    When UnitedHealth's deal team presented the proposal for the Change Acquisition to the Company's then-CEO in April 2020, they pointed to the potential for using Change's data to "improve medical policy and benefit design."  A subsequent memo explained that the data could also be used to monitor the pricing of medical procedures and expand insurance underwriting ("Internal Change Deal Memo").  At the same time, the deal team acknowledged a major risk: employing Change's data in these ways could trigger significant antitrust concerns.

234.    Although UnitedHealth frequently stressed the importance and reliability of its so-called "data firewalls" when publicly defending the Change acquisition, the

Company took a completely different approach behind closed doors. The Internal Change Deal Memo emphasized that Optum and UnitedHealthcare should adopt an "Enterprise thinking" mindset, stating in pertinent part:

> Where to start . . .
> We have SO much opportunity to put the breadth of our capabilities on full display and achieve true synergy and scale gains from our extensive capabilities. We need to ***stop thinking that just because we need to have financial and data firewalls between Optum and UHC means we can't show up together and harness the capabilities of both organizations together***. We need to take a deep look at how success is defined for each operating unit and how performance is rewarded and ***stop any compensation / reward plans that unintentionally inhibit Enterprise thinking*** or worse create moral hazards or incongruency with our strategic growth objectives. We need to improve our CRM systems and stop operating with many different instances of sales force that don't talk to another at some level. We need to continue the Enterprise Growth work aimed at building a total comprehensive view of our top existing and prospective accounts.

235. On March 3, 2021, Daniel Schumacher, UnitedHealth's Chief Strategy & Growth Officer, sent an email to Defendant Witty with a direct instruction: "Be explicit about what information we are going to share between companies … not just grant permission, but require it …."

236. Defendant Wichmann, who led UnitedHealth from September 2017 through March 2021, testified that access to Change's data was "the foundation by which the business case was made" for the acquisition. Defendant Wichmann further explained that Change's data was a critical strategic asset, emphasizing that "a network with no data isn't worth very much."

      **iii. UnitedHealth and Optum Knowingly Permitted Inadequate Data Governance**

237.    UnitedHealth repeatedly allowed UnitedHealth employees and Optum employees working on UnitedHealth projects to access sensitive competitor data.  This occurred despite the Company's assurances about the strength of the Company's data governance policies to the government and to the public when it was under antitrust scrutiny due to the Change Acquisition.  These assurances were not only false, but contradicted findings by the Company's own Integration Management Office, which documented that key systems like Salesforce Go, ContractHub, and the CDB lacked basic role-based access restrictions even after the transaction closed.  Despite having access to this information, the Individual Defendants continued to approve public statements and securities filings asserting that UnitedHealth had robust data segregation, compliance, and security.

238.    Peter Dumont ("Dumont"), UnitedHealth's current Chief Data Governance Officer, admitted during the DOJ Antitrust Suit that the Company labeled many competitively sensitive data fields as "standard" and made them broadly available across multiple business units.  For instance, the "covered amount" of a claim—the portion paid by an external payer's plan—was classified as "standard" and accessible in company databases.

239.    Permission logs kept by UnitedHealth and Optum further confirm that employees frequently accessed information outside their business unit.  The permission logs show several UnitedHealth employees were given access to external customer data, such employees include:

- A Director of Healthcare Economics for UnitedHealth's commercial health insurance business.
- A Healthcare Economics Consultant for UnitedHealthcare Networks.
- A Director of Data Science for UnitedHealthcare's Government Benefit Operations Segment.
- A Director of Data Analytics for UnitedHealthcare's Clinical Services Segment.
- A Business Analyst Consultant for UnitedHealthcare's Medicare & Retirement segment.
- A Senior Manager of Data Science for UnitedHealthcare's Clinical Services Segment.
- An Associate Director of Business Analysis for UnitedHealthcare's Payment Integrity Strategic Performance Division.
- A Senior Director of Actuarial Services for UnitedHealthcare's Medicare & Retirement Underwriting and Healthcare Economics Division.
- An Optum Insight employee who received access for "a contract with UnitedHealthcare Employer & Individual to provide de-identif[ied] benchmarking data."
- An Optum Insight employee who received access for "a funded agreement with [UnitedHealthcare] to do cost predictions for various groups from E&I," UnitedHealth's commercial health insurance business.
- An Optum Insight employee who indicated that "currently access is required to fulfill my role to pull and analyse [sic] data for a [UnitedHealthcare] group pricing project."

240.    UnitedHealth's recordkeeping practices were so inadequate that the true scale of the data governance problem may never be truly known.  For example, the Company had no access logs for its dNHI database, an Optum database that contained de-identified claims data, prior to May 2021—about three months *after* the government launched its antitrust investigation.  According to Dumont, before May 2021, the Company's *only* method to uncover improper access was by informally asking employees.  Dumont also admitted that UnitedHealth never notified external payers that UnitedHealthcare-affiliated employees had been given access to their data.

241.    Optum Rx's agreements with its external customers specifically contained clauses that state "[UnitedHealthcare] employees are not allowed to see or use the non-[UnitedHealthcare] book of business."   Contrary to these agreements, UnitedHealth admitted it granted "a handful" of UnitedHealthcare-affiliated employees access to the Optum Rx external customer data in dNHI.   UnitedHealth Director of Data Analytics Timothy Josephson reported this improper access to Dumont as early as in January 2021.

242.   In another example of UnitedHealth's data governance failures, UnitedHealth employees engaged in mass downloads of external customer data as recently as March 2022.   Dumont stated that in at least one incident, UnitedHealth employees accessed competitor data and copied it into UnitedHealthcare's case tracking system.

243.    The Individual Defendants had actual or at least constructive knowledge of UnitedHealth and Optum's data governance shortcomings but failed to take reasonable steps to correct them.   Defendant Witty admitted during the DOJ Antitrust Suit that in December 2021, UnitedHealth's Internal Audit and Advisory Services conducted an audit of UnitedHealth's data management practices, stating: "Given the potential pervasiveness and severity of the observations noted during the assessment," the auditors "assigned a rating of Needs Improvement to the Data Governance Internal audit."   In particular, UnitedHealth's internal auditors concluded that there was a "heightened risk of data being mismanaged" at Optum and "no effective means of enforcement if or when data misuse is discovered or reported" leading to a "risk that the [Enterprise Data Management Office] will be unable to effectively intervene and reinforce data management practices."

244.    Defendant Witty forwarded the report to his COO, writing: "A lot to do here." But Witty testified that in June 2022—six months later—that he still did not know whether any changes had been made to strengthen UnitedHealth's data governance.

---

[29] *See* UHG_FISTEL220_00004504; UHG_FISTEL220_00004508 (███████████████ ████████████).
[30] *See* UHG_FISTEL220_00007598-99 (███████████████████████████████).

████████████████████████████████████████████████████

███████████

249.    The Individual Defendants' oversight failures became catastrophic when, in February 2024, the Company disclosed the Change Date Breach involving more than 190 million individuals, which was later attributed to UnitedHealth's failure to implement standards safeguards like multi-factor authentication.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[35] *See* UHG_FISTEL220_00001309 (████████████████████████████████████████ ██████████████████████████████████████████████████ █████████).

[36] *See* UHG_FISTEL220_905 (██████████████████████████████████████████).
[37] *Id.*

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████

## VI.  INSIDER TRADING

252.    During the Relevant Period, the Insider Trading Defendants engaged in highly unusual and large scale insider trading, selling over two million shares of UnitedHealth common stock while in possession of material nonpublic information ("MNPI") for total proceeds of $657.5 million.  These significant and highly suspicious trades occurred around key corporate developments that had not yet been disclosed to the public.

253.    The first wave of insider stock sales occurred in 2016 while certain of the Insider Trading Defendants knew the Company was named as a Defendant in a False Claims Act suit filed under seal in which the DOJ intervened in 2017, also under seal. [39]

254.    The second wave of insider stock sales occurred in 2021, just one day after the OIG issued its 2021 OIG report on September 13, 2021, and in the wake of negative publicity surrounding UnitedHealth's Medicare Advantage billing practices that followed. Between September 14 and 17, 2021, Defendant Burke sold 15,000 shares of UnitedHealth

---

[38] *See* UHG_FISTEL220_906 (████████████████████████████).
[39] Defendants Hemsley, Hooper, Ballard, Burke, and Shine collectively sold $77,995,609 of personally held shares of UnitedHealth common stock between January 1, 2016 and December 31, 2017.

stock, for proceeds of $6.27 million, and then on November 23 and 24, 2021, Defendant Burke sold another 5,000 shares of UnitedHealth stock for proceeds of $2.24 million.

255. Just one month after the 2021 OIG Report was issued, Defendant Hemsley sold 125,000 shares of UnitedHealth stock between October 25, 2021, and October 26, 2021, for proceeds of more than $56 million—his second largest sale during the Relevant Period. The two-day sale was also larger than all but one sale Hemsley had made during the two-and-a-half-year period from April 17, 2019, through September 21, 2021.

256. A third round of suspicious sales occurred following the DOJ's efforts to block UnitedHealth's acquisition of Change Healthcare in 2022. As the trial for DOJ Antitrust Suit approached, on July 18, 2022, Defendant Witty made his largest sale of the Relevant Period, selling more than 11,000 shares of UnitedHealth stock for proceeds of more than $6 million. Then, on July 26, 2022, Hemsley sold 99,312 shares of UnitedHealth stock for proceeds of $53 million, Hemsley's third-largest sale during the Relevant Period and also larger than any single-day sale he made during the two-and-a-half year period from April 17, 2019, through September 21, 2021. On July 29, 2022, Defendant Rex sold 13,183 shares of UnitedHealth stock for proceeds of $7.14 million, Rex's largest sale ever. Then, on August 18, 2022, Defendant McMahon sold 14,715 shares of UnitedHealth common stock for proceeds of $7.99 million, his largest and only sale of stock.

257. The most suspicious trades occurred in late 2023 and early 2024, after UnitedHealth received a ***nonpublic*** notice of the October 2023 DOJ investigation. While investors remained in the dark, on October 17, 2023, Hemsley sold 121,515 shares of UnitedHealth stock for proceeds of over $65.68 million, followed by another sale of 66,081

shares on December 5, 2023, for proceeds of $36.37 million. Both of these sales were accompanied by the filing of a Form 144, certifying that "[t]he person for whose account the securities to which this notice relates are to be sold hereby represents by signing this notice that he does not know any material adverse information in regard to the current and prospective operations of the Issuer of the securities to be sold which has not been publicly disclosed."

258.    The suspicious trades made by the Individual Defendants eventually caught the attention of Congress. On April 29, 2024, Senators Warren and Edward Markey, along with 15 members of the United States House of Representatives, wrote a joint letter to the SEC, urging the Commission to investigate the nature of the sales. According to the letter, the "timing of these trades . . . raises numerous questions" about whether Hemsley had violated federal laws that prohibit trading while in possession of material, nonpublic information.

259.    Because these sales were suspicious in their timing, pattern, and magnitude, it shows that the Insider Trading Defendants abused their fiduciary positions to enrich themselves by using adverse, material non-public information about UnitedHealth's legal compliance in violation of their fiduciary duties.

## VII.    STOCK REPURCHASES

260.    The Individual Defendants substantially damaged the Company and wasted corporate assets by causing the Company to initiate repurchase 38.7 million shares of its own stock at a cost of $19.5 billion at artificially inflated prices from January 2016 through March 2025:

| Date | Number of Shares Repurchased | Average Price per Share ($) | Total Paid ($) |
|---|---|---|---|
| FY 2016 | 10,000,000 | 128.97 | 1,280,000,000 |
| FY 2017 | 9,000,000 | 173.54 | 1,500,000,000 |
| FY 2018 | 19,000,000 | 236.72 | 4,500,000,000 |
| March 2019 | 12,000,000 | 252.76 | 3,033,120,000 |
| June 2019 | 6,000,000 | 235.77 | 1,414,620,000 |
| September 2019 | 3,000,000 | 233.38 | 700,140,000 |
| December 2019 | 1,600,000 | 256.55 | 410,480,000 |
| March 2020 | 6,000,000 | 271.32 | 1,627,920,000 |
| September 2020 | 3,000,000 | 303.76 | 911,280,000 |
| December 2020 | 5,100,000 | 334.54 | 1,706,154,000 |
| March 2021 | 5,000,000 | 345.42 | 1,727,100,000 |
| June 2021 | 3,000,000 | 394.3 | 1,183,800,000 |
| September 2021 | 2,000,000 | 414.23 | 828,460,000 |
| December 2021 | 2,300,000 | 447.99 | 1,030,377,000 |
| January 2022 | 1,000,000 | 472.20 | 472,200,000 |
| February 2022 | 1,000,000 | 474.86 | 474,860,000 |
| March 2022 | 3,000,000 | 494.10 | 1,482,300,000 |
| April 2022 | 1,000,000 | 528.52 | 528,520,000 |
| July 2022 | 600,000 | 517.91 | 310,746,000 |
| August 2022 | 700,000 | 539.26 | 377,482,000 |
| September 2022 | 600,000 | 518.97 | 311,382,000 |
| October 2022 | 700,000 | 519.51 | 363,657,000 |
| November 2022 | 600,000 | 533.81 | 320,286,000 |
| December 2022 | 600,000 | 533.56 | 320,136,000 |
| April 2023 | 1,200,000 | 499.99 | 599,988,000 |
| August 2023 | 1,000,000 | 501.09 | 501,090,000 |
| October 2023 | 1,000,000 | 524.3 | 524,300,000 |
| November 2023 | 900,000 | 537.53 | 483,777,000 |
| December 2023 | 900,000 | 544.83 | 490,347,000 |
| January 2024 | 2,500,000 | 513.89 | 1,284,725,000 |
| February 2024 | 1,700,000 | 515.88 | 876,996,000 |

| March 2024 | 1,900,000 | 484.39 | 920,341,000 |
| July 2024 | 100,000 | 571.53 | 57,153,000 |
| August 2024 | 1,300,000 | 577 | 750,100,000 |
| September 2024 | 200,000 | 596.03 | 119,206,000 |
| October 2024 | 2,600,000 | 568.7 | 1,478,620,000 |
| November 2024 | 900,000 | 593.39 | 534,051,000 |
| December 2024 | 5,600,000 | 513.14 | 2,873,584,000 |
| January 2025 | 2,200,000 | 525.07 | 1,155,154,000 |
| February 2025 | 2,900,000 | 493.53 | 1,431,237,000 |
| March 2025 | 900,000 | 483.99 | 435,591,000 |
| April 2025 | 3,800,000 | 445.39 | 1,692,482,000 |
| May 2025 | 2,300,000 | 341.68 | 785,864,000 |
| **TOTAL** | **38,700,000** | **520.11** | **19,526,815,000** |

261.    The misconduct, however, did not end there.  The Individual Defendants continued to authorize and direct the repurchase of Company stock at artificially inflated prices while simultaneously causing the issuance of false and misleading statements to the market through March 2025.  Once the Company's true stock price was revealed in March 2025, it became clear that the Company had overpaid for its stock during this period.

262.    These harmful and wasteful actions are not entitled to the protection of the business judgment rule because they could not have been the product of a good-faith exercise of informed business judgment.  No rational director, acting on an informed basis and with due regard for the Company's best interests, would have approved or permitted such conduct while being aware of facts leading up to the Change Data Breach and throughout the duration of the CMS Fraud Scheme.  Instead, these actions reflect failure of oversight, lack of good faith, and disloyalty, each of which constitutes a breach of the

fiduciary duties owed by the Individual Defendants to the Company. As a direct and proximate result of these breaches, the Company has suffered substantial harm.

263. Despite the Individual Defendants' knowledge of the true facts about the Company's business and financial prospects, the Individual Defendants nevertheless authorized and/or executed the Company's purchases of its own stock at artificially inflated prices. Moreover, the Company's repurchases falsely signaled to shareholders and the public that the purchase of UnitedHealth stock at those prices was the best use of the Company's cash and the purchases of its stock at the market price prevailing at that time represented an accurate value for the Company. In truth, the Company's expenditures on its own stock were so recklessly improvident as to constitute corporate waste.

## VIII. DAMAGES TO THE COMPANY

264. As a result of the misconduct described herein, UnitedHealth has, and will continue to, suffer immense harm. The Individual Defendants have overseen and permitted a years-long sustained course of wrongful conduct that has exposed the Company to significant damages. These damages include damages stemming from multiple high-level governmental civil and potential criminal investigations, regulatory investigations, and a myriad of lawsuits. Further, the wrongful conduct described herein, along with other conduct that has been heavily publicized in the media, has made UnitedHealth a public pariah and inflicted a great deal of reputational harm.

265. As a result of the wrongful conduct described herein, which is directly attributable to the actions and/or inactions of the Individual Defendants, UnitedHealth is now defending against a damaging and costly Securities Class Action.

266.    On May 14, 2024, the City of Hollywood Firefighters' Pension Fund ("City of Hollywood"), on behalf of all persons who purchased UnitedHealth stock during the period September 22, 2021 and February 27, 2024, inclusive, filed a securities class action in the United States District Court for the District of Minnesota against UnitedHealth, Witty, Hemsley, and Thompson for violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.   On July 29, 2024, the Securities Class Action was re-captioned as *California Public Employees' Retirement System v. UnitedHealth Group Inc. et al.,* Case No. 0:24-cv-01743.

267.    On October 4, 2024, the lead plaintiff filed an amended consolidated complaint in the Securities Class Action.  Because new information has come to light about the severity and scope of Defendants' alleged CMS Fraud Scheme and the Change Data Breach, the Court allowed the lead plaintiff to amend or supplement its amended consolidated complaint since it was first filed on October 4, 2024.  The last supplemental amended consolidated complaint in the Securities Class Action was filed on June 24, 2025.

268.    Further, as a direct result of the misconduct described herein, UnitedHealth has suffered a significant loss in market capitalization and compromised financial integrity.  Also, as with any public entity, UnitedHealth will pursue future debt and equity offerings to finance its operations, and because of the Individual Defendants' misconduct, if left unpunished, UnitedHealth will suffer from the liars' discount and will be forced to conduct offerings on less favorable terms for the Company, which will only hinder future financing efforts.  The Company has and will continue to incur costs stemming from, among other

things, legal fees relating to public and private litigation, and regulatory investigations, and increased compliance costs.

269.    Finally, certain of the Individual Defendants have largely insulated themselves from the harm impacting UnitedHealth by selling large amounts of their personally held UnitedHealth stock at artificially elevated prices while in possession of and on the basis of MNPI.  These sales, along with the Company's award of lucrative payments and benefits to the culpable Individual Defendants, have substantially shifted any harm away from the Individual Defendants and on to the Company and its stockholders.

## IX.    DERIVATIVE AND REFUSAL ALLEGATIONS

270.    Plaintiff brings this action derivatively in the right and for the benefit of UnitedHealth to redress injuries suffered, and to be suffered, by UnitedHealth as a direct result of the wrongdoing alleged herein.  UnitedHealth is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

271.    Plaintiff will adequately and fairly represent the interests of UnitedHealth in enforcing and prosecuting its rights.

272.    Plaintiff has continuously been a stockholder of UnitedHealth at times relevant to the wrongdoing complained of and is currently a UnitedHealth stockholder.

273.    On May 30, 2025, pursuant to Delaware Rule of Civil Procedure 23.1, the Plaintiff made a formal written Demand to the Board requesting the Board to take appropriate legal action and seek all other appropriate relief against certain of the

Individual Defendants for the wrongdoing conduct described herein.  A true and correct copy is attached hereto as **Exhibit A**.

274.    On July 2, 2025, after having received no response to the Demand for over a month, Plaintiff's counsel delivered a follow-up letter, seeking confirmation that the Demand had been provided to the Board and requesting an explanation as to how the Board intended to proceed.  A true and correct copy is attached hereto as **Exhibit B**.

275.    On the same day, counsel for the Board responded in an email vaguely stating that the Demand had been put before the Board and that a substantive response would be coming soon.  **Exhibit C**.  There was no further information or detail regarding when or how the Board intended to respond to the Demand.  Now, more than six months after making a Demand on the Board and more than five months since the Board's amorphous response, the Board has not taken any action in response to the Demand.

276.    Because the Board has functionally ignored the Demand, its treatment of Plaintiff's allegations and request for action amounts to a *de facto* refusal of the Demand.

277.    While boards have broad latitude to make determinations with respect to investigating a litigation demand, they are not permitted to defer an investigation indefinitely.  *Mills v. Esmark, Inc.*, 91 F.R.D. 70, 73 (D.C. Ill. 1981) ("When . . . the shareholder has made a demand upon the corporation, it is incumbent upon the corporation to respond without delay.").[40]

---

[40] *See also Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del. 1988) (a corporation cannot "stand neutral" regarding a derivative action asserted on its behalf but

278.    As UnitedHealth's Board has provided no substantive response to Plaintiff's

Demand, the Board has wrongfully refused the Demand.  Therefore, Plaintiff initiates this

action on behalf of UnitedHealth to ensure the Company's valuable claims for relief are

properly and timely asserted.

## X.    <u>COUNT I</u>

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder**

**(Against the Individual Defendants)**

279.    Plaintiff incorporates by reference and reallege each and every allegation

contained above, as though fully set forth herein.

280.    During the Relevant Period, in connection with the Company's repurchases

of UnitedHealth stock, the Director Defendants disseminated or approved false or

misleading statements about the Company specified above, which they knew, or recklessly

disregarded, were false or misleading and were intended to deceive, manipulate, or defraud.

Those false or misleading statements and Individual Defendants' course of conduct were

designed to artificially inflate the price of the Company's common stock.

281.    At the same time that the price of the Company's common stock was inflated

due to the false or misleading statements made by the Individual Defendants, these

Defendants (as described in §VII, *above*) caused the Company to repurchase millions of

---

must affirmatively object to it or support it); *Rich ex rel. Fuqi International, Inc. v. Chong*, 66 A.3d 963, 976 (Del. Ch. 2013) (when a board fails to address the demand, the analysis "turn[s] on the time" that the board had "for response"); *Maccoumber v. Austin*, No. 03 C 9405, 2004 WL 1745751, at *3 (N.D. Ill. Aug. 2, 2004) ("Once demand is made, the board must investigate . . . and then decide . . . .").

shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements. The Individual Defendants engaged in a scheme to defraud UnitedHealth by causing the Company to spend at least $19.5 billion purchasing shares of UnitedHealth stock at artificially inflated prices during this period.

282. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon UnitedHealth in connection with the Company's stock repurchase during this period.

283. The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the United States mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of UnitedHealth stock, which were intended to, and did: (i) deceive the Company regarding, among other things, the CMS Fraud Scheme, Change Acquisition, and Change Data Breach alleged herein, the Company's internal controls, and the Company's financial statements; (ii)

artificially inflate and maintain the market price of UnitedHealth stock; and (iii) cause UnitedHealth to purchase the Company's stock at artificially inflated prices, and suffer losses when the true facts became known.

284.   At the time the statements alleged above were made, the Individual Defendants were in possession of the material, adverse, non-public information that, *inter alia*: (i) the Company was engaging in the CMS Fraud Scheme, Change Acquisition, and Change Data Breach alleged herein, violating antitrust laws and lacking basic data security protocols; (ii) the Company had inadequate corporate legal compliance and privacy resources; (iii) the Company ignored assessed the risks associated with the Company's illegal MA billing system and practices, Change Acquisition, and Change Data Breach; (iv) UnitedHealth failed to maintain effective internal controls over financial reporting and legal compliance; and (v) as a result of the foregoing, UnitedHealth's public statements, made or caused to be made by the Individual Defendants, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

285.   The Individual Defendants were senior management and directors of the Company and were directly responsible, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

286.   As described above in §V.G, *above*, the Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that these Defendants should have been aware of them.  Throughout

the Relevant Period, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

287.  The false or misleading statements of the Individual Defendants were made in connection with the Company's purchase or sale of the Company's stock

288.  As a result of the misconduct alleged herein of the Individual Defendants, UnitedHealth has, and will continue to, suffer damages in that it paid artificially inflated prices for UnitedHealth common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the CMS Fraud Scheme, the Change Acquisition, and Change Data Breach were fully disclosed.  Had UnitedHealth known of the material adverse information not disclosed by the Individual Defendants, or been aware of the truth behind the material misstatements, the Company would not have repurchased its own stock at the artificially inflated prices caused by the false or misleading statements of the Individual Defendants.

289.  As a direct and proximate result of the wrongful conduct of the Individual Defendants, the Company suffered damages in connection with its purchases of UnitedHealth stock during the Relevant Period.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## XI.   COUNT II

### Violations of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

290.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

291.    The Individual Defendants, by virtue of their positions with UnitedHealth and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of UnitedHealth and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause UnitedHealth to engage in the illegal conduct and practices complained of herein.

292.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XII.    COUNT III

### Breach of Fiduciary Duty

### (Against the Demand Defendants)

293.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

294.    The Demand Defendants owed fiduciary duties to UnitedHealth and its stockholders. Because of their positions as fiduciaries to the Company, the Demand Defendants owed duties of good faith, loyalty, candor, and truthful disclosure. In addition, the Demand Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct, which, had they been discharged in accordance with the Demand Defendants' obligations, would have prevented the Demand Defendants' misconduct and the consequent harm to the Company.

295.    The Demand Defendants violated their fiduciary duties by ignoring the claims alleged in Plaintiff's Demand and failing to take the necessary action required by law.  The Demand Defendants' refusal of the Demand was not made in good faith and was not the product of a valid exercise of business judgment.   The wrongful refusal thus constitutes a breach of the Demand Defendants' fiduciary duties of loyalty and good faith owed to the Company and its stockholders.

296.    As a direct and proximate result of the Demand Defendants' wrongful refusal of the Demand, UnitedHealth has been injured and continues to suffer harm, including the loss of valuable legal claims against responsible parties and the continuation of a governance environment that permitted the alleged misconduct to occur.

297.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XIII.  <u>COUNT IV</u>

### Breach of Fiduciary Duty

### (Against the Individual Defendants)

298.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

299.    The Individual Defendants owed fiduciary duties to UnitedHealth and its stockholders.  By reason of their positions as officers and directors of the Company, the Individual Defendants owed duties of good faith, loyalty, candor, and truthful disclosure. In addition, the Individual Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct, which, had

they been discharged in accordance with the Individual Defendants' obligations, would have prevented this misconduct and the consequent harm to the Company.

300.   The Individual Defendants consciously violated these duties by: (i) failing to develop and implement a system of controls to ensure that its businesses comply with positive law, specifically with regard to how the Company implements its Medicare Advantage billing practices and the Company's implementation of effective technological controls, (ii) once knowledgeable about the issues plaguing the Company, taking appropriate action to mitigate the harm to Members, the Medicare system, the Company, and its stockholders, and (iii) issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentation described herein. Furthermore, given the central nature of the Medicare Advantage program to the Company's overall operations, the Individual Defendants either knew, or should have known of the fraudulent billing practices and that the public statements concerning these matters were materially false or misleading. Likewise, given the size and scope of the acquisition of Change Healthcare, the Individual Defendants were or would have been fully aware of the status and capabilities of Optum's firewalls and internal policies over data sharing—making them aware that statements touting the effectiveness of the firewall and data protection capabilities were materially false and misleading.

301.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UnitedHealth has sustained significant damages. Accordingly, the Individual Defendants are liable to the Company.

302.   Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XIV.  COUNT V

### Insider Selling

### (Against the Insider Trading Defendants)

303.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

304.    As directors and officers of UnitedHealth, Hemsley, Witty, Rex, McMahon, Hooper, Ballard, Burke, and Shine owed fiduciary duties to UnitedHealth and its stockholders.  By reason of these fiduciary relationships, those individuals specifically owed UnitedHealth the highest obligation of good faith, fair dealing, loyalty, and due care when taking any actions motivated by the Company's material nonpublic information.

305.    When the over $657 million in stock sales described herein were made, the Insider Trading Defendants were aware of the Company's fraudulent Medicare Advantage billing practices; and for Witty, Hemsley, and Rex, were also aware of the lack of sufficient firewalls and data protection policies.  As noted above, these sales occurred suspiciously close to OIG and DOJ investigations and actions, but before the public had any knowledge. Despite the Insider Trading Defendants' knowledge, they nonetheless chose to sell their personally held stock based on the MNPI alleged herein, using that information for their own benefit and to the detriment of the Company.

306.    The Insider Trading Defendants' sales of UnitedHealth common stock while in possession and control of this MNPI was a breach of their fiduciary duties of loyalty and good faith.

307.    Because the use of material nonpublic information for their own gain constitutes a breach of the fiduciary duties by Insider Trading Defendants, the Company is entitled to damages.

308.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XV.    COUNT VI

### Violations of Section 20A of the Exchange Act

### (Against the Insider Trading Defendants)

309.    Plaintiff incorporates by reference and reallege each and every allegation set forth above, as though fully set forth herein.

310.    The Insider Trading Defendants, by reason of their relationships with the Company as officers and directors, had access, directly or indirectly, to material information about the Company not available to the public.

311.    The Insider Trading Defendants knowingly traded on this material, non-public information about the Company.  The Insider Trading Defendants sold UnitedHealth securities with actual knowledge that the value of these securities was inflated as a result of Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

312.    As part of UnitedHealth's publicly disclosed stock repurchase program, UnitedHealth was a contemporaneous purchaser of UnitedHealth securities, pursuant to Section 20A of the Exchange Act, when the Insider Trading Defendants sold UnitedHealth securities contemporaneously with the purchases as described above.

313.    As a contemporaneous purchaser, UnitedHealth was damaged by the actions of the Insider Trading Defendants, as alleged in this Complaint, in that: (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements.  At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

314.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XVI.  COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

315.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

316.    The wrongful conduct alleged herein was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

317.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation to certain of its directors and officers; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending UnitedHealth and certain of its officers against the Securities Class Action.

318.    Furthermore, the Director Defendants caused the Company to waste its money by authorizing repurchases of UnitedHealth stock at artificially inflated prices as described above in §VII.

319.    Plaintiff, as a stockholder and representative of UnitedHealth, seeks restitution from the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

320.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XVII. <u>COUNT VIII</u>

### Against the Individual Defendants for Unjust Enrichment

321.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

322.    By their wrongful acts and omissions, and violations of law, the Individual Defendants were unjustly enriched at the expense of and to the detriment of UnitedHealth.

323.    The Individual Defendants either benefited financially from the improper conduct, or received bonuses, stock options, or similar compensation from UnitedHealth that was tied to the performance or artificially inflated valuation of UnitedHealth's stock or received compensation that was unjust in light of the Individual Defendants' misconduct.

324.    Defendants Hemsley and Witty were further unjustly enriched when they sold more than $216 million worth of their personally held UnitedHealth stock while in possession of material nonpublic information.

325.    Plaintiff, as a stockholder and representative of UnitedHealth, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

326.    Plaintiff, on behalf of UnitedHealth, has no adequate remedy at law.

## XVIII.    COUNT IX

### Contribution Pursuant to Section 21D of the Exchange Act for Violations of Section 10(b)

### (Against the Individual Defendants)

327.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

328.    Defendants Witty and Hemsley are named as defendants in the Securities Class Action, which alleges that they violated Sections 10(b) and 20(a) of the Exchange Act by affirmatively making false and/or misleading statements and caused class members of the Securities Class Action to purchase UnitedHealth's securities at an inflated price.

329.    The misconduct of Defendants Witty and Hemsley, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

330.    UnitedHealth is named as a defendant in the Securities Class Action that alleges and asserts claims arising under § 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  If UnitedHealth is found liable for violating the federal securities

laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

331. As officers, directors, and otherwise, Defendants Witty and Hemsley had the power or ability to, and did, control or influence, either directly or indirectly, UnitedHealth's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

332. Furthermore, the Director Defendants authorized the repurchase of UnitedHealth's stock at artificially inflated prices, causing the Company to overpay for its own stock. These authorizations were conducted while the Director Defendants knew about the DOJ investigations, the circumstances surrounding the Change Data Breach, and the CMS Fraud Scheme.

333. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

334. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

335. No adequate remedy at law exists for Plaintiff by and on behalf of UnitedHealth.

## XIX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of UnitedHealth, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of UnitedHealth and that Plaintiff is an adequate representative of the Company;

B.    Against all of the Individual Defendants and in favor of the Company for the damages sustained by the Company as a result of the Individual Defendants' breach of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to UnitedHealth;

D.    Directing UnitedHealth to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect UnitedHealth and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's internal controls over Medicare Advantage operations, including medical and billing operations;

2.      a proposal to strengthen UnitedHealth's legal compliance function with respect to MA billing policies and procedures, consumer and patient privacy laws, and antitrust laws;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a proposal to strengthen UnitedHealth's oversight of its disclosure procedures;

5.      a proposal to permanently separate the position of CEO and Chair of the Board; and

6.      a proposal to strengthen the Company's control over insider transactions.

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of UnitedHealth has an effective remedy;

F.      Awarding to UnitedHealth restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## XX.    JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 12, 2026

*s/Shawn M. Perry*

Shawn M. Perry (MN ID #185000)

**PERRY & PERRY, PLLP**
950 Wayzata Blvd. E., Suite 103
Wayzata, MN 55391
Telephone: (952) 546-3845
Email: shawn.perry@pppllp.com

**JOHNSON FISTEL, PLLP**
Michael I. Fistel, Jr.
William W. Stone
Oliver S. tum Suden
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
Email: michaelf@johnsonfistel.com
williams@johnsonfistel.com
olivert@johnsonfistel.com

*Counsel for Plaintiff Michael Miller*

## VERIFICATION

I, Michael Miller, hereby declare as follows:

I am the plaintiff in this action. I do hereby verify that I am a holder of common stock of UnitedHealth Group, Inc. and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "Complaint"). I have reviewed the allegations made in the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury pursuant that the foregoing is true and correct.

Signed and Accepted:

Dated: 12/19/2025

Signed by:

s/ *Michael Miller*
A26B8B41ACF7471...

MICHAEL MILLER